**UNITED STATES of America,**
**Plaintiff,**

v.

**James W. KILLOUGH, Defendant.**

**Crim. No. 977–60.**

United States District Court
District of Columbia.

April 20, 1961.

Arthur J. McLaughlin, Asst. U. S. Atty. (Oliver Gasch, U. S. Atty.), Washington, D. C., for plaintiff.

William B. Bryant, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

Following a trial by jury which resulted in his conviction of manslaughter,[1] defendant here moves for judgment of acquittal notwithstanding the verdict or for a new trial. Principally at issue is whether the Court correctly admitted into evidence a confession without which the jury's verdict cannot be sustained.

For purposes of this motion, the preliminary facts may be stated as follows: On October 18, 1960, in response to a report to the police that defendant Killough's wife had been missing for five days, Lieutenant Daly of the Homicide Squad went to defendant's home and conversed with him for about an hour. At the conclusion of this interview, the Lieutenant asked defendant to come to police headquarters the following day to discuss the matter further. Defendant agreed to the request, but did not keep the appointment or otherwise contact the police the next day or the four following days.

During that time the police made an intensive investigation of Mrs. Killough's disappearance and of defendant's activities before and after she was last seen. From people who had called and visited

---

1. 22 D.C.Code § 2405. Although the Government originally charged defendant with first degree murder, it asked for submission of the case to the jury only on the lesser-included offenses of second degree murder and manslaughter.

the Killough home to inquire about Mrs. Killough's absence, they learned that defendant had shown a strange indifference to it, and that his report to the police had come only after some prodding from his brother-in-law. The police also forwarded to FBI blood analysis specialists the floor mat from the trunk of Mrs. Killough's car—on which stains that looked like blood had been seen—and were informed that their suspicions were correct.

Early on the morning of October 24, Lieutenant Daly was telephoned by a friend of the defendant, a Miss Holmes, who informed him that defendant was at her residence. The Lieutenant and Detective Bell went there immediately, arriving about 9:00 a. m. On arrival they spoke briefly with defendant, arrested him, and asked him to accompany them to police headquarters to discuss the reported "disappearance." No statement of a specific crime with which he was charged was made to defendant when he was thus arrested.

The group arrived at headquarters about 9:30 a. m. and went to the office of the homicide squad on the third floor, where Lieutenant Daly and Detectives Bell and Preston questioned defendant, apparently uninterruptedly, until about noon—the interrogation centering on defendant's whereabouts on the day his wife disappeared. About noon, lunch was brought into the homicide office and the group ate and conversed generally for about an hour.

After lunch questioning resumed, becoming more accusatory in nature. Defendant was informed that some of his morning answers had been found false by police investigation and that blood had been found in the trunk of his wife's car, and questioning began in earnest on whether he had killed his wife and on where he had disposed of her body. According to Lt. Daly and Detective Pres-

ton, defendant would neither deny nor admit killing his wife, asserting a right to refrain from giving statements of a self-incriminatory nature. His only formal statement during this period was an exculpatory one—given in both written and oral form. He also (at least twice, by police testimony) made general requests for an attorney. On each occasion the interrogators offered to call any lawyer he named, asking him first if he wanted any particular lawyer, to which he replied in the negative, and then offering him a telephone directory to look for one, which he refused—contending that he could not make a rational choice under these circumstances. The questioning continued until 10:00 p. m., when defendant asked for its cessation because he was tired. He was then placed in the police headquarters cell block—charged with "investigation."

About 9:00 a. m. the next day, October 25, defendant was again brought to the homicide office—without breakfast —and questioned for about an hour.[2] Still refusing to make any statement about possible involvement in his wife's disappearance, he was then taken to the office of Deputy Chief of Police Scott. There—during a session lasting about an hour—he confessed that in mid-afternoon of October 13, in a fit of rage at his wife's failure to answer his accusations of marital infidelity, he had choked her to death, and that during that evening he had carried her body to the trunk of her car and driven around with it for several hours before finally burying it in a wooded spot near the Anacostia River. Defendant agreed to lead the police to this location. Following these statements, the charge against defendant was formally changed to homicide.

Then, between 1:45 a. m. and 12:30 p. m. on the 25th, defendant was taken to the spot where he had placed his wife's body. Upon return to police headquarters, a written statement was taken from

---

**2.** The number of questioners at this session is uncertain because of conflicting police testimony. Lt. Daly stated that he and Detective Preston both inter-

rogated; the Detective stated that he left the room immediately upon defendant's arrival.

him, completion of which came at approximately 2:00 p. m.

For reasons detailed below,[3] the Court —prior to trial and after a full hearing —suppressed these detention-produced confessions,[4] as well as defendant's on-the-scene identification of his wife's body, and they are not at issue in this motion.

Finally, at 3:43 p. m. on October 25— over thirty hours after defendant's arrest—he was brought before a United States Commissioner for the preliminary proceedings which Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S. C.A., requires "without unnecessary delay" after an arrest. He was advised— both by the Deputy Clerk and by the Commissioner himself—that he had the right to refrain from making any statement; that any statement he made could be utilized as evidence in a trial against him; that he was entitled to retain counsel; that he was entitled to a preliminary hearing at which either he or his attorney could cross-examine; and that he was entitled to a continuance in order to retain counsel.

Because the defendant said he was undecided on possible representation by counsel, and because the Government had no witnesses available, both sides consented to an adjournment of the proceedings until November 15. Pending this hearing, defendant was ordered committed, without bail, to the D. C. Jail, the charge against him then being first degree murder.[5]

Before being taken to the jail, and again the next morning, defendant spoke with Miss Holmes and at one of these meetings—probably the second—requested her to secure an attorney.

3. Part I, *infra.*

4. There were, in total, three of them, two oral (to Deputy Chief Scott and to Lt. Daly) and one written. They are hereinafter referred to as the "first confessions."

5. Thus events occurring subsequent to this proceeding before the Commissioner

About 1:00 p. m. the next afternoon, October 26, Lt. Daly, the officer in charge of the investigation in this case and one of those to whom defendant had confessed the day previously, went to the D. C. Jail and filled out a form indicating a desire to see defendant in order to return some articles of clothing which defendant had brought to police headquarters on his arrest and to ascertain his wishes concerning disposition of his wife's body.[6]

Defendant agreed to see the lieutenant and the pair conversed at a table in the rotunda of the jail for about an hour. According to the lieutenant, the conversation in substance and order consisted of defendant's agreeing to release the body of his wife to an undertaker; his statements that he had read of the finding of the body in the newspapers, heard other inmates talking about it, and felt glad they did not know who he was; his claim that he would not have killed his wife unless she had been "cheating on him"; an account of his activities on the day of the murder, including the details of its perpetration and of his disposal of the body; and defendant's request that the lieutenant call a finance company to tell them where his car could be found. In addition, at some time early in the conversation—before defendant gave the "confession"—a lawyer came to the table where the two men were sitting, greeted defendant by name, and offered to assist him in any way he desired. After the lawyer departed, the lieutenant asked defendant whether he yet had an attorney and was told that he did not, but that he had sent Miss Holmes to get one for him.

The lieutenant testified that although he is familiar with the Mallory [7] rule's

are referred to as "post-commitment" events.

6. According to the lieutenant, responsibility for the latter matter is lodged in the homicide squad.

7. Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

bar against confessions obtained during a period of illegal detention, and with the Goldsmith [8] decision of the Court of Appeals (which held that in some circumstances after proceedings before a committing magistrate, an invalid, illegal-detention confession can become validated through reaffirmation), he did not go to the jail on the 26th with any intention other than to return the indicated articles and to secure release of defendant's wife's body. Lt. Daly further testified that before going he had not talked to anyone in the United States Attorney's Office about the confessions of the 25th, nor did he have with him at the jail a copy of those confessions.

This is the third time in this proceeding in which admissibility of the post-commitment confession has been argued. The first review was by the Court subsequent to assignment of the case for trial but prior to empaneling a jury. At that time the Court heard testimony from the officers who arrested defendant; from those who interrogated him prior to appearance before the Commissioner, and secured the invalidated first confessions; from the present Commissioner, who, as Deputy Clerk, participated in the preliminary proceeding; and from the officer who procured the post commitment confession.[9] Invalidation of the first confessions followed that hearing.

The second challenge to the post-commitment confession came at trial, outside the presence of the jury, when the Court determined that it was not, as a matter of law, involuntary.

In addition, after testimony as to giving of this confession had been repeated to the jury [10] along with the other evidence against the defendant, the Court instructed that the confession could not be considered unless the Government had proved beyond a reasonable doubt (1) that the defendant had, in fact, given it as testified; (2) that it was voluntary; and (3) that it was corroborated sufficiently to be trustworthy.[11] The Court also instructed the jury that a confession by one in custody should be considered with caution and scrutinized with care. Implicit in the jury's verdict was its finding that the Government had proved the three enumerated essentials beyond a reasonable doubt; for the Court also instructed that as a matter of law, the evidence other than the confession was insufficient to convict defendant.

## I

Although admissibility of the confessions secured from defendant during the thirty-hour period between his arrest and his appearance before the Commissioner is not at issue in this post-trial motion, the Court would like to indicate why it had no doubt of their inadmissibility—and why defendant's pre-commitment identification of his wife's body was also excluded.

■■ The direct and concise reason for suppression of the confessions was that in this case the police did precisely what Rule 5(a) and the cases interpreting it squarely forbid: they delayed the appearance of an arrested person before a committing magistrate by taking him

"to police headquarters in order to carry out a process of inquiry that len[t] itself, even if not so designed,

---

8. Goldsmith v. United States, 1960, 107 U.S.App.D.C. 305, 277 F.2d 335.

9. Although the Court indicated to defendant and his counsel that defendant could take the stand at this hearing on admissibility of confessions and the two which followed without waiving his privilege of silence as to the merits of the charge, defendant did not avail himself of these opportunities.

10. In his testimony before the jury recounting defendant's post-commitment confession, the lieutenant—pursuant to instructions from the Court—scrupulously refrained from any mention of the pre-commitment confessions.

11. See generally, Opper v. United States, 1954, 348 U.S. 84, 92–94, 75 S.Ct. 158, 99 L.Ed. 101 and Smith v. United States, 348 U.S. 147, 152–56, 75 S.Ct. 194, 99 L.Ed. 192.

to eliciting damaging statements to support the arrest and ultimately his guilt."[12] Detention for this purpose being "unnecessary" and therefore illegal, any confessions which result from it—no matter how voluntary or trustworthy—are excluded as evidence.

■ An additional reason for suppression of the oral confessions which preceded defendant's being charged with homicide is that they occurred while he was "booked" and being held on the "charge" of "suspicion." This was, in legal effect, no charge at all; "[t]he police may not arrest upon mere suspicion but only on 'probable cause' "[13] and for a legally-punishable crime.

If the police did, in fact, have probable cause to arrest defendant for homicide on the morning of the 24th of October, that is the charge which should have been lodged against him. The charge being an illegal one, the custody was illegal, and there is great probability that a confession procured from one in unlawful custody—even where there is no delay in arraignment—is equally to be suppressed as a confession procured during a period of unlawful delay from one legally arrested. Goldsmith v. United States, 1960, 107 U.S.App.D.C. 305, 311, note 6, 277 F.2d 335; Trilling v. United States, 1958, 104 U.S.App.D.C. 159, 176, 260 F.2d 677 (concurring opinion). But see Tyler v. United States, 1951, 90 U.S. App.D.C. 2, 7, 193 F.2d 24; and cf. United States v. Carignan, 1951, 342 U. S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48.[14]

■ There having been a period of unnecessary delay in violation of Rule 5(a), the Court of Appeals' ruling in Bynum v. United States,[15] and similar decisions,[16] also required exclusion of testimony recounting defendant's identification of his wife's body during this period. As the Court said in Bynum:

"In these situations it is deemed a matter of overriding concern that effective sanctions be imposed against illegal arrest and detention and the risks of overreaching inherent in such action. Even though highly probative and seemingly trustworthy evidence is excluded in the process, this loss is thought to be more than counterbalanced by the salutary effect of a forthright and comprehensive rule that illegal detention shall yield the prosecution no * * * advantage in building a case against the accused. * * * If one such product of illegal detention is proscribed, by the same token all should be proscribed."[17]

## II

The admissibility of defendant's post-commitment confession is, however, a more difficult matter. Basically, the issue presented is whether an accused who, prior to delayed appearance before a committing magistrate, has made a confession which is ruled *invalid* can—after such appearance and after being advised of his privilege against self-incrimination—make a *valid* confession without having consulted counsel and/or without counsel's presence.

■ Several basic principles regarding confessions which are relevant

12. Mallory v. United States, supra, 354 U.S. at page 454, 77 S.Ct. at page 1359.

13. Id.

14. There was also a contention that these confessions were invalid because procured in the absence of counsel, but the Court did not reach it. However, the uncertainty of the law in this area is reflected by the discussion in Part II, *infra*, and by the fact that the Supreme Court has granted certiorari in a state case making, *inter alia*, this contention.

Atchley v. California, 1959, 53 Cal.2d 160, 346 P.2d 764, certiorari granted, 1960, 362 U.S. 987, 80 S.Ct. 1081, 4 L. Ed.2d 1021.

15. 1958, 104 U.S.App.D.C. 368, 262 F.2d 465.

16. United States v. Klapholz, 2 Cir., 1956, 230 F.2d 494, 498; United States v. Townsend, D.C.D.C.1957, 151 F.Supp. 378, 385 (dictum).

17. 104 U.S.App.D.C. at page 370, 262 F. 2d at page 467.

and binding on this court should be stated at the outset:

First:

"The mere fact that a confession is made to the police, or while an accused is in custody, does not destroy its value as evidence. Once an accused has been legally charged and is in lawful detention, neither reason nor authority forbid police interrogation."

Goldsmith v. United States, supra, 107 U.S.App.D.C. at page 311, 277 F.2d at page 341.

Second:

"Making a confession under circumstances which preclude its use [does not] perpetually disables the confessor from making a usable one after those conditions have been removed."

United States v. Bayer, 1947, 331 U.S. 532, 541, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654. This is true even where the original confession is made after an illegal arrest and during a period of unlawful detention; and even where the invalid confession is utilized in procuring the second and where the second follows within a few hours of the first.[18] In other words, the "fruit of the poisonous tree" doctrine [19] does not apply in this area,[20] and the cleansing process may be a very rapid one if the applicable conditions are satisfied.[21]

■ Third: Rule 5(a) and the decisions which have interpreted it do not establish, as an inflexible rule, that the "police [can]not interrogate a suspect before giving him an opportunity to secure counsel." Cicenia v. LaGay, 1958, 357 U.S. 504, 509, 78 S.Ct. 1297, 1300, 2 L.Ed.2d 1532.

Utilizing these principles, the Court of Appeals has recently decided three cases in which the basic fact pattern is the same as it is here: (1) inadmissible confession during a period of unlawful detention, (2) appearance before a committing magistrate, (3) repetition of the confession.

In the first of these, Jackson v. United States [Jackson I], 1959, 106 U.S.App. D.C. 396, 273 F.2d 521, the second confession consisted of defendant's signing a written confession which had been prepared on the basis of his earlier, inadmissible oral admissions. The court there held the written document equally inadmissible, and stated its result in terms which appear to establish a test for admissibility:

"Jackson's signing of the document cannot in any way be considered an independent act based upon proper counsel or as occurring after time for deliberate reflection. Rather, the signature was obtained as a result of a purposeful process of inquiry undertaken during a period of unlawful detention."

106 U.S.App.D.C. at page 398, 273 F.2d at page 523.

In the second of these cases, Goldsmith v. United States, supra, the second confessions came within an hour of the defendants' appearance before a committing magistrate, who warned them of their rights, and of a fifteen-minute conference with an attorney, who similarly warned them. The confessions took place at police headquarters, to which defendants had been returned under the committing magistrate's order for the precise purpose of permitting further police interrogation. Counsel was not present at this post-commitment session;

18. Goldsmith v. United States, supra.

19. See, e. g. Nardone v. United States, 1938, 308 U.S. 338, 60 S.Ct. 266, 84 L. Ed. 307.

20. Goldsmith v. United States, supra, 107 U.S.App.D.C. at page 310, 277 F.2d at page 340; and Note, 74 Harv.L.R. 1222 (1961).

21. This principle undercuts and refutes defendant's contention that his post-commitment confession should be ruled invalid because it is the end-product of an illegal chain of events; under these decisions, his commitment on a valid homicide charge was untainted by illegal charges and detention which may have preceded it.

the U. S. Marshall was. The permitted confessions took three forms: reaffirmation of the earlier, inadmissible confessions after a reading of them; a colloquy with the complaining witness; and a re-enactment of the crime at its scene. The Court upheld the legality of this post-commitment interrogation, and the lawful character of the confessions received, in this language:

"Unless we were to hold that police interrogation and police investigation are to be proscribed both before and *after* arraignment [sic], the contention of the appellants that there was illegal interrogation after the arraignment must fall. * * * Once an accused has been legally charged and is in lawful detention, neither reason nor authority forbid police interrogation. [citation omitted]

* * * * * *

"The appellants not only re-affirmed their formal written statements while they were lawfully detained, but did so in utterances which were plainly spontaneous and at a time when both the judicial warning and the advice of counsel as to their right to remain silent were more than an hour old." [22]

In the third of these cases, Jackson v. United States, [Jackson II], D.C.Cir. 1960, 285 F.2d 675, the Court of Appeals upheld reception into evidence of a reaffirmation of defendant's original confession which was given later than the reaffirmation denied validity in Jackson I. The reaffirmation here upheld took place at the D. C. Jail on the day following the second of what, in effect, were two preliminary hearings and advice of "able counsel," [23] and was procured during police questioning regarding another matter—to which defendant consented, as did Killough in the instant case. The

Court sustained the reaffirmation with the following language:

"* * * the Supreme Court has made it clear that a challenged confession voluntarily given after fair warning may be competent. We have so decided as to a confession reaffirmed after judicial caution has been imparted.[24]

* * * * * *

"* * * the conditions which had prompted our earlier exclusion had been removed. We must view cumulatively the * * * series of warnings to Jackson. In the first place, the police had fully advised him of his rights before taking his written statement. The language prefacing the confession 'cautioned the prisoner in almost the words of the Judges' Rules of England.' Next, on Sunday, he was cautioned pursuant to Rule 5 by Judge Fickling. Monday, he received emphasis of the benefits of the Rule at the hands of Judge Smith in the presence of his counsel. He had had the advantage of consultation with his own attorney who advised him of his right to remain silent. Finally, Jackson of his own free will had consented to the Tuesday interview, as he voluntarily signified in writing. He then talked to the detectives, saying exactly what he desired to say and no more. By that time he had been fully warned and his own statement discloses he was entirely aware of what he was saying."[25]

In the face of the general principles outlined, and these three cases in particular, defendant makes the following alternative contentions: (1) that the Commissioner's order adjourning the preliminary hearing meant to immunize him from making a valid statement about this crime until he had seen a lawyer;

22. 107 U.S.App.D.C. at page 311, 277 F.2d at page 341.

23. 285 F.2d at page 677. Counsel in Jackson, as here and in Mallory, was Mr. William B. Bryant.

24. Id. at page 679.

25. Id. at pages 679–680.

(2) that even if the order did not have this effect, Rules 5(a), (b) and (c) should be interpreted to have it; (3) that even if these rules would not generally be interpreted in this fashion, they must be so construed where prior to an abbreviated preliminary hearing—consisting only of the Commissioner's various warnings—there has been a period of illegal detention during which an inadmissible confession has been given; (4) that the Sixth Amendment to the United States Constitution, as applied in Federal criminal prosecutions, gave him an absolute right in this fact situation to see counsel before a valid confession could be given by him and/or to have counsel present with him at the time he made the October 26 confession; (5) that even if neither the Federal Rules nor the Constitution gave him the right to counsel in either form contended for, the challenged confession should have been barred because it is the product of a deliberate police attempt to subvert the commitment process and the Mallory rule; and (6) that even if the Jackson I test of a valid post-commitment confession be applicable in a situation where no counsel has been seen by an accused, he did not have "time for deliberate reflection", which that test says is owed him. Defendant further maintains that if the right to counsel was constitutionally his, he did not waive it by permitting the session to take place or continue.[26]

At the argument on the present motions, counsel for defendant with commendable frankness conceded that in the light of present law, including decisions of higher courts binding on this court, he did not believe that the Court could justify accepting, at the trial level, his requests for significant extensions of that law, though he felt his client's interests required his seeking from the

Court (even if his motions were denied) a full and detailed discussion of the law.

With those frank sentiments of defendant's counsel the Court agrees, as its full discussion below of each of defendant's contentions indicates. For those reasons, defendant's motions must be denied.

■ (1) The Commissioner's order adjourning the preliminary hearing stated that this was being done to enable defendant to decide whether he desired counsel and to give the Government the opportunity to collect its witnesses, and remanded defendant to custody of the United States Marshal. It did not state that defendant was to be kept incommunicado until the hearing was resumed —or at least until he had seen counsel— and thus did not prevent defendant from voluntarily agreeing to speak with anyone before he had seen an attorney. The action of the D. C. Jail authorities, acting for the United States Marshal, in allowing Lieutenant Daly to see the defendant was, therefore, not a violation of the commitment order, as it would have been if the jail authorities had, for example, turned defendant over to the police for secret interrogation. cf. Trilling v. United States, 104 U.S.App.D.C. 159, 176, 260 F.2d 677 (concurring opinion).

(2) As the Mallory opinion stressed, the Federal Rules of Criminal Procedure envision a rather distinct series of steps at the outset of a criminal proceeding. Rules 4 and 5 require that an arrest be only on probable cause. Rule 5(a) requires that one arrested be brought "without unnecessary delay" before a commissioner or other committing magistrate. "And Rules 5(b) and (c) reveal the function of the requirement of prompt arraignment:

"'(b) *Statement by the Commissioner*. The commissioner shall in-

---

26. Since the Court decides that each of these contentions must be rejected, it does not reach the non-waiver argument. See generally, Johnson v. Zerbst, 1938, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461; Evans v. Rives, 1942, 75 U.S.

App.D.C. 242, 248 note 7, 126 F.2d 633; Griffith v. Rhay, 9 Cir., 1960, 282 F.2d 711, 717–718. But cf. Ashdown v. Utah, 1958, 357 U.S. 426, 428, 78 S.Ct. 1354, 2 L.Ed.2d 1443.

form the defendant of the complaint against him, *of his right to retain counsel* and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. *The commissioner shall allow the defendant reasonable time and opportunity to consult counsel* and shall admit the defendant to bail as provided in these rules.

" '(c) *Preliminary Examination.* The defendant shall not be called upon to plead. \* \* \* If the defendant does not waive [preliminary] examination, the commissioner shall hear the evidence within a reasonable time. The defendant may cross-examine witnesses against him and may introduce evidence in his own behalf. If from the evidence it appears to the commissioner that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the commissioner shall forthwith hold him to answer in the district court; otherwise the commissioner shall discharge him. \* \* \*.' " [emphasis added].[27]

But the Rules do not reveal the exact purpose of the requirements that defendant be informed of his right to retain counsel and that he be allowed "reasonable time and opportunity to consult counsel." These phrases could be read, in conjunction with Rule 5(a)'s requirement that an accused be brought quickly before a commissioner after arrest, to be part of a scheme to bring counsel to defendant's assistance as quickly as possible in the criminal process against him.[28] In line with this reading, they

could be further interpreted to provide for a hiatus in the process until consultation with counsel had taken place, so that before an accused entered upon the progressively more accusatory stages of the process—grand jury proceedings, arraignment, deposition-taking, possible proceedings to suppress illegally-seized evidence, and the trial itself—he would have full opportunity to review what had happened prior to appearance before a committing magistrate. Such an opportunity for consultation with a learned, impartial advisor would also give an opportunity to an accused who, though innocent, had become enmeshed in a web of circumstances too complicated for his own unravelling to be advised against action which would further complicate his situation, and grant him assistance in clearing himself of the charges as quickly as possible. Obviously, further conversation with an officer who had previously secured a confession from an accused would be incompatible with this interpretation of the rules.

■ But in view of the background of Rule 5 and of its other provisions, the above reading is not the more reasonable one; and it is quite clear that such a meeting as occurred between the defendant and Lieutenant Daly at the D. C. Jail on October 26, with defendant's consent and without counsel present, and the confession which ensued, were not in violation of the Rules. First, the right to counsel given by Rule 5(b) is a limited one, being only the "right to *retain* counsel"; in other words, no right to counsel is given by the Rule itself to indigents, even for formal representation at the preliminary hearing. That this was consciously done is amply demonstrated by the change in the Rule from its form in first draft to its present wording,[29] and by remarks of its drafters.[30]

27. 354 U.S. at pages 453–454, 77 S.Ct. at page 1359.

28. See, e. g. United States v. Klapholz, D.C.S.D.N.Y.1955, 17 F.R.D. 18, 22, affirmed, 2 Cir., 1956, 230 F.2d 494.

29. The word "retain" was inserted between "right to" and "counsel" when the provision of the Rules for the Commissioner's statement was changed from its original status as Rule 6(a) to its present place in the Rules. Compare the present Rules with Federal Rules of Criminal Procedure—Preliminary Draft (G.P.O.1943).

30. See Federal Rules of Criminal Procedure and Proceedings of the Institute

Second, even at a preliminary hearing, defendant could waive his right to retain counsel and proceed on his own. Finally, and most important, the drafters of the Rules had before them—and rejected—the Scottish exclusionary rule which provides that

"Interrogations of arrested persons by the police are forbidden and confessions and admissions obtained in this way are inadmissible in evidence * * * 'Police authorities are not permitted to examine him [the prisoner] without the protection of a magistrate.' " [31]

Thus the clearer meaning of the rule is that it gives an accused who has funds to hire counsel the right to do so, and the right to have his preliminary hearing—should he desire one with counsel's assistance—postponed until he secures that assistance. And from the rule makers' revision of the sentence in Rule 5(a) providing for advice by the committing magistrate as to the meaning of the privilege against self-incrimination,[32] and from their comment that an indigent might not have counsel until arraignment, it seems clear that they felt the magistrate's warning—and not additional advice from counsel—would be sufficient to comply with any requirement operative at this stage of the proceedings that an accused have knowledge of the privilege.

■■■ (3) The short answer to the contention that the rules for preliminary hearing and post-preliminary hearing

procedures should be interpreted differently because prior thereto violations of other rules have taken place is that this factor does not appear to have been taken into account either by the rule makers or by any decisions under the rules. Though the rule makers were aware of illegal detentions,[33] they did not require in any fashion that the fact of such detention be made known to the committing magistrate; further, the approach of the *Goldsmith and Jackson II* cases, summarized heretofore, is to consider the preliminary proceedings before the committing magistrate and the activities which follow as "unpoisoned" by any prior illegality. In the face of these factors, it is not for this Court to take such a novel approach to application of the Rules.

(4) Defendant's next—and strongest —contentions are (a) that he was constitutionally entitled, as a necessary implementation of his privilege against self-incrimination, and before he could give a valid confession or confessions, to have counsel's explanation of the privilege and his indication of the invalidity of the first confessions, and/or (b) that he was constitutionally entitled, as part of his Sixth Amendment right to counsel, to have an attorney present during the kind of confrontation he and Lt. Daly had at the D. C. Jail on October 26.

Although the two contentions are somewhat similar and overlapping, it is necessary to emphasize their differences. The thrust of the former contention is

on [Those Rules] (N.Y.U. School of Law 1946) at 78 (drafters' note to Rule 44 "Assignment of Counsel": " * * * the right of the defendant to have counsel assigned by the court relates only to proceedings in court and, therefore, does not include preliminary proceedings before a committing magistrate."); 129 and 239 (remarks of Judge Holtzoff); and 215–16 (remarks of Professor Waite). But see 74 Stat. 229 (1960) Legal Aid Agency established to represent indigents in District of Columbia; said agency "shall make attorneys available to such defendants for representation at preliminary hearings and coroner's proceedings").

31. See Federal Rules of Criminal Procedure—Preliminary Draft, supra, note 29, at 11–16.

32. Compare the original form of the rule, Id. at 16: ("The commissioner shall * * * inform the defendant that any statement made by him may be used against him."); with its present wording: ("The commissioner shall * * * inform the defendant that he is not required to make a statement and that any statement made by him may be used against him.")

33. See the discussion cited supra, note 31.

that without counsel's explanation of the privilege against self-incrimination, and especially without advice as to the invalidity of the first confessions, there was not the complete knowledge of the existence of the privilege which is constitutionally required. On the other hand, the latter contention is that, even assuming defendant's requisite knowledge of the privilege, his jail confrontation with the lieutenant was a "step in the proceedings against him" at which he was constitutionally entitled to counsel's presence.

(a) Three premises would seem to underlie defendant's first contention: that once a defendant is charged with a crime, he has a constitutional right to be informed of his privilege against self-incrimination; that where a defendant has made a confession which is invalid for any reason, such constitutional guarantee includes the right to be informed of the invalidity of these prior statements; and, finally, that a committing magistrate's warning, as required by Rule 5(a) and as given here, does not satisfy this alleged requirement.

The first premise is undercut by those decisions upholding voluntary confessions made in periods of "necessary delay" between arrest and appearance before a committing magistrate.[34] There is no indication in any of these cases whether or not the defendants involved knew of the privilege's existence, just as they may not know of it before making extra-judicial confessions to accomplices, sweethearts, and similar non-official persons.

Even if there is a constitutional right to know of the privilege which comes into existence at the time of appearance before a committing magistrate, there is no authority which indicates that such advice must be given by both the magistrate and counsel. As previously noted,

the Federal Rules of Criminal Procedure, as approved by the Supreme Court, explicitly recognized that a preliminary hearing might be held without defendant's representation by counsel. While later Supreme Court rulings[35] might seem to indicate that the Court today would hold counsel in such proceedings to be constitutionally required, none of these rulings have indicated that such representation would be necessary in order to implement the guarantee that one accused be informed of the privilege. Nor do the recent cases of the Court of Appeals which include consultation with counsel as one of the factors lending validity to post-commitment confessions (Goldsmith and Jackson I & II) make this factor the *sine qua non* for effectiveness of advice about the right to silence. Rather the Court's mention of such consultation seems to be in connection with its discussion of the "independence" of a "second" confession from an invalid predecessor.

Finally, the contention that meaningful appraisal of the privilege must include advice of the invalidity of prior confessions—in other words, advice that a defendant still has ability to make effective use of the privilege—is answered, at least so far, by the statement in Goldsmith that counsel who advises a defendant at appearance before a committing magistrate

"need only warn the client of his absolute right to remain silent and the consequences of not doing so."[36]

Although the constitutional principles here followed will apply equally to innocent accused as to those subsequently found guilty, and advice of counsel at the earliest possible moment after an accused's arrest is his best protection, this Court's responsibility for following the law as laid down by higher courts, where that law is reasonably clear, bars

34. e. g. Heideman v. United States, 1958, 104 U.S.App.D.C. 128, 259 F.2d 943.

35. Discussed *infra*, contention (4) (b).

36. 107 U.S.App.D.C. at page 309 note 3, 277 F.2d at page 339. Compare Id., at page 316, 277 F.2d 335 (dissenting opinion); and Trilling v. United States, 1958, 107 U.S.App.D.C. 159, 177–178, 260 F.2d 677, 695–696 (concurring opinion).

its acceptance of the position here argued.

(b) To support his contention that he was constitutionally entitled to counsel's presence during his confrontation with Lt. Daly in the D. C. Jail on October 26, defendant maintains that it was a "step in the proceedings against him"—contending that if it was, Supreme Court cases since Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, made counsel's presence mandatory. To support this position he argues, first, that the discussion was an "interrogation" by an arm of the prosecution; and further, that even if it was not, his conclusion must still be upheld. For purposes of the arguments, defendant accepts, as he must, the jury's conclusions, implicit in its verdict, that the confession was in fact given, that it was voluntary, and that it was trustworthy, and the Court's conclusion that it was "independent" of the invalid first confessions.

*First.* Defendant does not maintain that the Sixth Amendment invalidates every post-commitment confession made by an accused in the absence of counsel. He concedes the unimpeachability of a confession voluntarily given in such circumstances to a visitor or cellmate, or one spontaneously made to a jailer or even a policeman. Rather, defendant's initial contention is that the moment one who is an "agent" of the prosecuting authorities asks a single question about an alleged crime, an "interrogation" or "inquisition" is begun which is a "step in the proceedings against him" and at which counsel's presence is constitutionally required.

Assuming, *arguendo,* defendant's conclusion that were this post-commitment confrontation an interrogation, counsel's presence would be a constitutional right, the Court rejects this line of argument because, in its opinion, the basic premise is incorrect; the confrontation was not an interrogation.

As the statement of facts demonstrates, the circumstances were not those of an interrogation. Though defendant was in custody, the interview occurred in a location observable by other than the authorities—the D. C. Jail rotunda.[37] Only one officer was present. For the officer to see defendant at all, the latter's consent was needed. No compulsion to answer any question was, or could be applied. Defendant was free to end the conversation at any time.

Further, the content of the discussion was not that of an interrogation. Its initial stages consisted of defendant's indicating desire to accept some clothes he had previously left at the police station, willingness to release his wife's body for burial, and relief that the jail's other inmates had not connected him with a newspaper story of the finding of his wife's body. Its confessional stage was introduced by a single question or comment by the police officer.

Defendant apparently concedes that if the confessional stage had begun with a statement by defendant—for example, that he wanted to make sure the lieutenant understood his confession story as accurately or sympathetically as possible —the confrontation would not have become an interrogation. But, he contends, because the confession was preceded by a prodding or triggering statement by the lieutenant,[38] the character of the

---

37. This contention by the Government is not contradicted by defendant, and is confirmed by Lt. Daly's testimony that during the discussion a lawyer friend of defendant's came uninvited to speak to defendant.

38. There is some conflict in the evidence and contentions as to the exact wording of this statement. The lieutenant testified at the pre-trial hearing that the

statement was a question to defendant: "Was everything you said in your confession yesterday correct?" or words quite similar, and testified at the hearing outside the presence of the jury that his triggering remark was: "You sure did cause me a lot of trouble yesterday not talking, and then going into my boss * * *" [Deputy Chief Scott], after which defendant apologized and offered to supplement his previous statements. De-

conversation changed to an accusatorial or investigative one. Whether it did is, of course, a matter of judgment. In view of all the circumstances set out above, the Court believes it did not. While the dogmatic statement cannot be made that "one question never makes an interrogation," the picture here, in the Court's view, is one of a man willingly desiring to unburden himself [39] and of the question as an insignificant factor.

*Second.* If, contrary to this Court's view, the confrontation did become an interrogation, or if its precise character be deemed irrelevant, the question of whether defendant had a constitutional right to have counsel present is a more difficult one.

Three basic principles established by the Supreme Court underlie the present phase of this discussion. The first, enunciated in Powell v. State of Alabama, supra, 287 U.S. at page 69, 53 S.Ct. at page 64, is that a defendant is constitutionally entitled to "the guiding hand of counsel at every step in the proceedings against him;" the second, stated most clearly by the Court in Chandler v. Fretag, 1954, 348 U.S. 3, 9, 75 S.Ct. 1, 5, 99 L.Ed. 4, is that:

"[r]egardless of whether [defendant] would have been entitled to the appointment of counsel, his right to be heard through his own counsel was unqualified;"

and the third, also reiterated in Chandler v. Fretag, is that if there is a right to counsel at a certain proceeding, "reasonable opportunity" must be given a defendant to employ and consult with him.[40]

Although these principles were announced in cases which dealt with the right to counsel at trial itself, other cases—under both the Sixth and Fourteenth Amendments, but employing the Sixth's basic guarantee that:

"[i]n all criminal prosecutions, the accused shall enjoy the right * * to have the Assistance of Counsel for his defence"—

have extended the right to several pretrial stages. Principally, it has been held applicable to arraignments at which a plea is required, e. g. House v. Mayo, 1945, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739; Evans v. Rives, 1942, 75 U.S.App. D.C. 242, 126 F.2d 633; and five present Justices of the Supreme Court, if their combined opinion would correspond with their separate ones, have indicated that it extends to post-indictment *secret interrogations.*[41] Spano v. People of State of New York, 1959, 360 U.S. 315, 324–327, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (concurring opinion of Douglas, J., joined by Black and Brennan, JJ., and concurring opinion of Stewart, J., joined by Douglas and Brennan, JJ.); and Crooker v. State of California, 1958, 357 U.S. 433, 441–448, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (dissenting opinion of Douglas, J., joined by Warren, C. J. and Black and Brennan, JJ.). Beyond this the Court has extended the right to counsel to other pre-trial proceedings only if by its denial a defendant is:

"so prejudiced * * * as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.' " Crooker v. State of Califor-

---

39. Cf. Upshaw v. United States, 1948, 335 U.S. 410, 413, 69 S.Ct. 170, 93 L.Ed. 100 [interpreting United States v. Mitchell, 1944, 322 U.S. 65; 64 S.Ct. 896, 88 L. Ed. 1140].

fendant's counsel contends the lieutenant said, "Have you got anything to say in addition to what you said in your statement?" The Court's conclusion as to the character of the session is the same regardless of which one of these statements was made.

40. 348 U.S. at page 10, 75 S.Ct. 1.

41. Although there is substantially similar language in these opinions to the effect that counsel is available in such situations to an "accused who wants [one]," they cannot be read, without more, as indicating that such request is necessary for the right to counsel to exist—in other words, that these Justices would relax in any way the presumption against waiver of this right. See the cases cited supra note 26.

nia, supra, 357 U.S. at page 439, 78 S.Ct. at page 1292.[42]

However, neither these general principles nor their extensions in the cited cases establish, at present, the right to counsel in the situation presented by this case.

First, the Spano concurrence of Mr. Justice Stewart,[43] which added his assent to some of the principles agreed to by the four dissenting Justices in Crooker, relied for its result on at least three factors not present here, in the opinion of this Court: secrecy, interrogation, and the fact that defendant had been indicted.[44]

Second, the Crooker dissent and the other concurrence in Spano both rely on the secrecy factor, with its concomitant danger of an involuntary confession produced by either the "third degree" or psychological coercion.

Third, though Crooker and its most apt companion case, Cicenia v. La Gay, 1958, 357 U.S. 504, 78 S.Ct. 1297, 2 L. Ed.2d 1532 were state cases, filtering the Sixth Amendment through the Fourteenth, their majority opinions are still our most authoritative pronouncements in this area.[45] As indicated, they denied the right to counsel in secret interrogation situations, one of which involved an accused who had been arrested and booked before confessing, the other involving a "suspect." While neither involved an individual like the present defendant who had appeared before a committing magistrate for warning as to his rights and not determination of probable cause for arrest, this factor does not appear of great significance, while the absent factors of secrecy and interrogation do so appear. Further, in Cicenia, the Court in dicta indicated that

"[e]ven in federal prosecutions this Court has refrained from laying down [a rule that] police could not interrogate a suspect before giving him an opportunity to secure counsel."

357 U.S. at page 509, 78 S.Ct. at page 1300; while earlier, in United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48, a federal prosecution in which the Court dealt with a murder charge confession made after interrogation by one validly committed for another crime, it had stated, Id., at page 39, 72 S.Ct. at page 99:

"So long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given." [46]

Finally, there are the decisions and statements of the Court of Appeals. Most explicitly, in Porter v. United States, 1958, 103 U.S.App.D.C. 385, 392,

---

42. For a case applying this test to invalidate a confession, see *Griffith v. Rhay*, supra note 26.

43. 360 U.S. at pages 326–327, 79 S.Ct. 1202.

44. That Mr. Justice Stewart cited Crooker as a case to be distinguished, even though the defendant there had been arrested and booked before confessing, indicates that the fact of indictment was of some importance in his Spano position. On this basis, *inter alia*, the two post-Spano New York cases cited by defendant may be distinguished. People v. DiBiasi, 1960, 7 N.Y.2d 544, 200 N.Y.S. 2d 21, 166 N.E.2d 825; and People v. Waterman, 1960, 12 A.D.2d 84, 208 N.Y.

S.2d 596. And see People v. Downs, 1960, 8 N.Y.2d 860, 203 N.Y.S.2d 908, 168 N. E.2d 710.

45. But see Snee and Pye, "Due Process in Criminal Procedure: A Comparison of Two Systems," 21 Ohio St.L.J. 467, 483 n. 99 (1960) ("It may be doubted whether the Supreme Court would have decided Crooker and Cicenia the same way if the cases had arisen under the sixth amendment.")

46. Nor can the statement in Chandler v. Fretag, supra, that a defendant has an "unqualified" right to be heard through retained counsel, be interpreted, without more, to apply to this situation.

258 F.2d 685, 692, Mr. Justice Reed,[47] speaking for a unanimous panel, stated:

> "The time that an accused is entitled to counsel for the protection of his rights on criminal charges is from arraignment, that is plea after indictment, to the conclusion of his trial."

Further, as the Court of Appeals revealed in Lampe v. United States,[48] two prior per curiam opinions of the Court have summarily overruled a contention that a putative defendant is entitled to counsel at a coroner's inquest.[49] Whether these cases involved defendants who had been arrested prior to being taken before the coroner's hearing is not clear, and certainly there are other distinguishing factors between such a proceeding and the confrontation involved here, but both share the common pre-indictment characteristic of a proceeding involving a defendant where counsel's absence might disadvantage him. In addition, there are Goldsmith and Jackson II, in which questioning of just this sort was upheld. While it does not appear that the present facet of the "right to counsel" argument was made in either case, they—and the langauge they employ—are weighty matters for this Court to consider.

In view of these decisions, and because of the Court's conclusion that the confession in question was not the product of an interrogation—so that it cannot be struck down unless the Court is willing to hold that a defendant, after commitment, cannot make a valid confession in the absence of counsel—and because the Supreme Court, in Spano, supra, 360 U.S. at page 320, 79 S.Ct. at page 1205, deliberately left open the question of whether

> "following indictment [a] confession obtained in the absence of counsel can be used without violating the Fourteenth Amendment"

(and therefore the Sixth), the Court has determined that it is required to apply the law as the cases have previously expounded it and leave to higher authorities any extensions of the principles found in those cases.

Especially is the Court reluctant to resolve the unanswered Spano question in defendant's favor because the reasons he advances for extending the right to counsel to include his fact-situation are even fewer than those which underlay the contention in Spano itself, and because he can point to no case in which the specific rationale he advances as justifying the right has been accepted in any majority opinion.

Heretofore, the cases have supported grant of the right to counsel before trial in order to prevent possible third degree interrogations which are, in effect, determinations of guilt, and may result in involuntary confessions,[50] or to cross-examine on defendant's behalf at formal adversary proceedings,[51] or to advise of the privilege against self-incrimination to one ignorant of it,[52] or to give adequate time for trial preparation,[53] or to

---

47. Who had previously written, on behalf of a unanimous Supreme Court:
   " * * * denial of opportunity to consult with counsel on any material step after indictment or similar charge and arraignment violates the Fourteenth Amendment." Hawk v. Olson, 1945, 326 U.S. 271, 278, 66 S.Ct. 116, 120, 90 L. Ed. 61.

48. (No. 15383) (opinion of May 12, 1960), p. 2; opinion vacated on other grounds and reaffirmed, en banc, March 9, 1961, D.C.Cir., 288 F.2d 881.

49. Ross v. United States, 1959, 105 U.S. App.D.C. 341, 267 F.2d 618, certiorari denied, 360 U.S. 939, 79 S.Ct. 1464, 3 L.Ed.2d 1551; Williams v. United States, 1959, 105 U.S.App.D.C. 348, 267 F.2d 625, certiorari denied, 360 U.S. 939, 79 S.Ct. 1464, 3 L.Ed.2d 1551. See also Neely v. United States, 1944, 79 U.S.App. D.C. 177, 144 F.2d 519.

50. These are the arguments made by the Justices concurring in Spano and dissenting in Crooker.

51. e. g. Evans v. Rives, supra note 26.

52. e. g. Id.

53. Powell v. State of Alabama, supra, 287 U.S. at page 71, 53 S.Ct. 55, 77 L.Ed. 158.

take pre-trial steps without which trial itself becomes unduly difficult.[54]

On the other hand, the rationales offered here for right to counsel are essentially prophylactic: that his presence and advice would guard defendant against making incriminatory statements and would prevent police distortion or misrepresentation of what occurs at such interrogations. Although the latter argument has weighty support in Supreme Court dissenting opinions,[55] it has not yet commended itself to a majority of the court, nor has the former argument.

■■■ (5) Defendant's contention that this second confession should have been excluded by the Court because it was the product of a deliberate police attempt to subvert the Rules and the commitment process is more easily rejected.[56] The Court—which itself asked Lt. Daly the questions whose answers would have laid the foundation for such a charge—is satisfied that the lieutenant testified truthfully in stating that he did not go to the jail on the 26th to secure a reaffirmation of the invalid confessions and that he had not spoken to the U. S. Attorney's Office about them before going.[57]

■■■ (6) Finally, the applicable test for determining the validity of the second confession being its "independence" from its invalid predecessors, and that fact turning on whether it occurred "after time for deliberate reflection,"[58]

Jackson v. United States, supra, 106 U. S.App.D.C. at page 398, 273 F.2d at page 523 the Court is satisfied that, considering all the circumstances, sufficient time did elapse.

First, defendant specifically renounces any claim that he was physically maltreated during the period of "unlawful" detention. Thus, he did not require a significant time period after commitment to recover his reflective powers, if, indeed, he had ever lost them. Second, following the preliminary hearing and his meeting with Lt. Daly, defendant was permitted two conversations with his friend Miss Holmes. Third, the time period which passed between the preliminary hearing and the second confession was over twenty hours. Fourth, defendant's conversation with the lieutenant prior to his actually making the second confession indicated that he had been reflecting on his crime. All these factors support the Court's previously expressed conclusion that during this period defendant had a resurgence of guilt feelings which prompted his desire to confess anew, and support its present conclusion that such confession came after adequate time for "deliberate reflection."[59]

### III

■■■ Before concluding, the Court must indicate its reason for permitting receipt at trial of testimony concerning

---

54. Hawk v. Olson, supra note 49.

55. In re Groban, 1957, 352 U.S. 330, 340–41, 77 S.Ct. 510, 1 L.Ed.2d 376; Crooker v. California, supra, 357 U.S. at page 447, 78 S.Ct. 1297.

56. Invalidation would have been sanctioned as an exercise of the inherent power of a federal court to assure adherence by federal officers to honorable standards in detection and prosecution of crime. See, e. g., Rea v. United States, 1956, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233.

57. In evaluating the officer's credibility, the Court has considered the fact that a

significant number of recent cases indicate that the police have been securing post-commitment reaffirmations of pre-commitment confessions. See, e. g. Jackson I and II and Goldsmith, supra, and United States v. Naples, D.C.D.C., 192 F. Supp. 23.

58. There is obviously no claim that the confession was made after "proper counsel," the alternative method of assuring separateness of the two confessions.

59. See also Lyons v. Oklahoma, 1944, 322 U.S. 596, 604, 64 S.Ct. 1208, 88 L.Ed. 1481.

defendant's post-commitment identifications of his wife's body.

As previously indicated in this opinion, the Court refused to allow the Government to utilize as evidence defendant's action during the period of "unnecessary delay," in leading police to the underbrush where he had hidden his wife's body, and his statement on arrival at this spot that "you'll find her over there." Therefore, the Government at trial proved that the body of Goldie Killough had been found—thus assisting in the corroboration of defendant's confession—in a more roundabout way. First, the D. C. Coroner testified that acting on information that a body had been found in a wooded area off Jay Street, N. E. near the Anacostia River, he went to that spot, pronounced the body dead, and had it taken to the morgue. Second, Sterling W. Hackett, a funeral home owner, testified that after receiving a request to remove from the D. C. morgue a body claimed to be that of Goldie Killough, he was taken by a minister-friend of Mrs. Killough to the D. C. Jail on October 26 to obtain from defendant a release of this body. He further testified that defendant signed the release, and also asked when the body could be viewed. Finally, Lt. Daly, as earlier recounted, testified that as part of his October 26 D. C. Jail conversation with defendant—which preceded that with Mr. Hackett—defendant had agreed to sign a release for his wife's body.

■ The short answer to defendant's contention that this testimony should not have been received is that, as previously indicated, the recent Court of Appeals' decision in the Goldsmith case [107 U.S.App.D.C. 305, 277 F.2d 340] clearly holds the "fruit of the poisonous tree" doctrine inapplicable to cases where the "poisonous tree" is a violation of Rule 5(a). That ruling being the law binding on this Court, this testimony was properly permitted.