James W. KILLOUGH, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16398.

United States Court of Appeals
District of Columbia Circuit.

Argued June 11, 1962.

Decided Oct. 4, 1962.

Mr. William B. Bryant, Washington, D. C. (appointed by the District Court), with whom Messrs. William C. Gardner and Joseph C. Waddy, Washington, D. C., were on the brief, for appellant.

Mr. David C. Acheson, U. S. Atty., with whom Messrs. Charles T. Duncan, Principal Asst. U. S. Atty., Arthur J. McLaughlin, Asst. U. S. Atty., and Nathan J. Paulson, Asst. U. S. Atty., at the time of argument, were on the brief, for appellee. Mr. Daniel J. McTague, Asst. U. S. Atty., also entered an appearance for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER and WRIGHT, Circuit Judges, sitting *en banc.*

FAHY, Circuit Judge, with whom Circuit Judges EDGERTON, BAZELON and WASHINGTON join.

Appellant, indicted for first degree murder in strangling his wife to death, was convicted of manslaughter. The case is another in which a conviction of a serious crime has been brought about with the aid of a confession orally given soon after—in this case the next day—a written confession had been obtained in circumstances which rendered it inadmissible. Other oral confessions had preceded the written one and like it were inadmissible.

Three cases involving this problem have been decided fairly recently by this court. Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335, cert. denied, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed. 2d 86; Jackson v. United States, 109 U.S.

App.D.C. 233, 285 F.2d 675, cert. denied, 366 U.S. 941, 81 S.Ct. 1666, 6 L.Ed.2d 852, with Mr. Chief Justice Warren and Mr. Justice Douglas noting that they would grant certiorari, and Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618. In Goldsmith and Jackson, by a divided vote, divisions of this court held that the second, reaffirming confessions, were admissible. The dissent in each case was based on the ground, not here repeated *in extenso,* that the second confession stemmed so directly from the illegally procured and inadmissible first confession that it was also inadmissible. So to hold was deemed essential to preserve the integrity of the Mallory-Upshaw-McNabb rule protective of the right of an arrestee to be taken before a magistrate as required by Rule 5(a) of the Fed.R.Crim.P., 18 U.S.C.A., which, though in form a Rule, has the full effect of statutory law.

In Naples this court sitting en banc found it unnecessary to pass upon the admissibility of the later confession; yet the record frankly revealed that it was obtained for the purpose of circumventing the Mallory rule, as appears from a colloquy between court and prosecution counsel in the case:

"[The court:] Now, I presume that the reason an attempt was made to get another statement from the defendant is as an insurance against the rule of the Mallory case.

"[The Assistant United States Attorney:] Yes, Your Honor, there is no question of that.

"[The court:] This was before the Goldsmith case was decided * * * which held that the Mallory rule did not apply to post-arraignment statements.

\* \* \* \* \* \*

"[Mr. Murray, Defense Counsel] Q. Mr. [Officer], I think the Court has assumed, and Mr. [Prosecutor] has assured us that your only reason for going to the jail to talk to this defendant was to satisfy what might be the additional requirements in the application of the Mallory rule, is that correct?

"A. That is correct."

The excellent opinion of Judge Youngdahl in the present case, filed when he denied appellant's motion for a judgment of acquittal notwithstanding the verdict or for a new trial, demonstrates the soundness of his exclusion during the trial of the earlier oral and written confessions obtained in stark violation of the rights of the accused.[1] See United States v. Killough, 193 F.Supp. 905 (D.D.C.1961). The accused was retained in custody by the police some 34 hours after arrest, during which time the process of obtaining a confession was pursued.

We are aware that the Supreme Court has not placed the Mallory exclusionary rule on the Constitution, as it has the exclusion of evidence obtained by an unreasonable search and seizure. As to the latter see Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. But it is nevertheless true that the rules of evidence pertaining to confessions in a federal trial have been formulated on the background of both the Fifth Amendment, particularly its provision that no person shall be compelled in any criminal case to be a witness against himself, and the well recognized right of an accused when arrested to be promptly taken before a magistrate who shall inquire into the sufficiency of the basis for his arrest, advise him of his rights, and determine whether he shall be admitted to bail and on what conditions. McNabb v. United

---

1. Judge Youngdahl said:
   "The direct and concise reason for suppression of the confessions was that in this case the police did precisely what Rule 5(a) and the cases interpreting it squarely forbid: they delayed the appearance of an arrested person before a committing magistrate by taking him 'to police headquarters in order to carry out a process of inquiry that len[t] itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.'" 193 F. Supp. at 909–910.

States, 318 U.S. 332, 342, 63 S.Ct. 608, 87 L.Ed. 819.

In the present case, after the police had violated the law embodied in Rule 5(a) for a sufficient length of time to enable confessions to be obtained, appellant, who had sought to avoid confessing and on at least two occasions requested a lawyer, was taken before a magistrate. The magistrate advised him that he was entitled to obtain counsel and that he was not required to make a statement—this latter caution being especially ironic considering what had already occurred. Appellant not having obtained counsel, and desiring to do so, the magistrate with the consent of both sides adjourned the preliminary hearing from October 25 to November 15. In the meantime appellant was committed to the District of Columbia Jail. There, on the next day, and before appellant had obtained counsel, the officer who had participated principally in obtaining the inadmissible confessions the day before, obtained an oral confession which the trial court admitted in evidence upon the basis of our Goldsmith and Jackson decisions.[2] It is apparent, however, from the opinion of Judge Youngdahl to which we have referred, that in admitting this "reaffirming" confession he felt bound by the decisions of this court. This is entirely understandable. This court, however, sitting now for the first time en banc to consider the problem, draws a distinction which Judge Youngdahl might well have felt he was not required to do. The distinction we draw between the present case and both Goldsmith and Jackson is

due to the fact that our brethren who constituted the majority of the divisions of the court which decided those cases relied to a substantial degree upon the fact that in each case the accused actually had the advice of counsel before the re-affirming confession was made.

Thus, in Goldsmith the opinion states,

"The appellants not only re-affirmed their formal written statements while they were lawfully detained, but did so in utterances which were plainly spontaneous and at a time when both the judicial warning and the advice of counsel as to their right to remain silent were not more than an hour old." 107 U.S.App.D.C. at 311, 277 F.2d at 341.

In Jackson the opinion states,

"Not only did appellant on Monday [before the oral confession] have the advice of able counsel, but Judge Smith at the second [preliminary] hearing observed, and appellant's attorney agreed, that on Sunday Judge Fickling [at the first preliminary hearing] had advised appellant of his rights."
Again,

"He had had the advantage of consultation with his own attorney who advised him of his right to remain silent." 109 U.S.App.D.C. at 235, 237–238, 285 F.2d at 677, 679–680.

In the present case, as we have said, completion of the preliminary hearing had been postponed to enable the accused to obtain counsel, but he had not done so

---

2. The officer testified, *inter alia*, that he went to the jail to take some articles appellant had left at Homicide Headquarters, a task it was by no means necessary for the officer himself to perform or, in the performance of it, personally to see or talk with appellant. He said, however, that he talked with him about half an hour. He asked him if he remembered anything he had not told in his statement, to which he replied, "My statements is just about the same" with an exception he mentioned, and he then went into the full details again. In this way

the officer came into possession of a full reaffirming confession even if the earlier ones were ruled out. Of course appellant was only repeating what he had already said when he had been held by the police in violation of Rule 5(a). On cross examination the officer said he had read a case which indicated that a confession obtained before arraignment, although it was no good, it was all right to talk about it after arraignment if the defendant made a reference to it or repeated it.

at the time the oral confession was made at the jail the following day.[3]

Another circumstance distinguishes this case from Goldsmith. In holding the oral re-affirmation of the pre-arraignment confessions admissible the majority there relied upon, and outlined at some length, a colloquy between the defendants and one of the persons robbed and another person. See 107 U.S.App.D.C. at 311, 277 F.2d at 341.[4]

Accordingly, neither Goldsmith nor Jackson requires admission of the jail confession in this case. Were the situation otherwise, a majority of the court, which now for the first time considers the problem en banc, would be ready to reconsider those cases.

■ The oral confession obtained in this case at the jail so soon after the illegally procured and inadmissible confessions must be held inadmissible as the fruit of the latter.[5] To admit it would in substance and effect admit the earlier confessions properly held inadmissible, and thus defeat the exclusionary rule. To hold otherwise would be in reality to permit an accused to be tried without counsel, jury or court, alone with police at their headquarters or at jail. The public trial guaranteed by the Constitution, with counsel, jury and court, after indictment, would be hardly more than a form for validation of what had already been accomplished invalidly.

■■ We do not, however, set appellant free. We reverse and remand for a new trial because of the erroneous admission in evidence of the oral confession given at the jail. Although the question before us for decision on this appeal is not whether appellant is guilty of the crime of which he was convicted, were we to assume the truth of the confessions we would nevertheless be required to grant a new trial, for we necessarily concern ourselves with means, not alone with ends. Under the law—including of course the administration of the criminal law in the federal courts—a lawful end is not accomplished by the use of evidence rendered inadmissible by unlawful means. Every rule of evidence which excludes from a trial relevant and material evidence could be said to suppress the truth in the sense of limiting the means by which the facts may be developed. Thus, the penitent's disclosure to his confessor is under a seal not to be broken at a trial for crime, however true the confession; the doctor may not abuse in the name of truth the confidence of his patient, nor the lawyer that of his client, nor one spouse that of another.[6] The rules the law imposes as limitations upon the means it will use in obtaining evidence have been adopted for reasons which outweigh the need to use the excluded evidence. To turn the law into a means of obtaining convictions by violating constitutional and statutory safe-

**3.** In answering a question from the court during the first oral argument of the present appeal the United States Attorney frankly pointed out the difference between being advised of one's right to counsel and actually having counsel's advice.

**4.** The Bayer case referred to in the majority opinion in Goldsmith is United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, where the confession held admissible was made six months after the one assumed by the Court to have been obtained in violation of the McNabb rule. The difference between that case and this one is obvious.

**5.** Our authority so to hold when the re-affirming confession is not independent of

a previously obtained inadmissible confession was recognized by this court in Jackson v. United States, 106 U.S.App.D.C. 396, 273 F.2d 521, decided by Mr. Justice Burton, retired, and Circuit Judges Washington and Danaher.

**6.** In Elkins v. United States, 364 U.S. 206, 216, 80 S.Ct. 1437, 1443, 4 L.Ed.2d 1669, the difference between these privileges due to status of the witness and exclusion of the evidence because of unlawful police conduct is recognized. But the Court also recognized that the exclusion based on such conduct outweighs "the general need for untrammeled disclosure of competent and relevant evidence in a court of justice."

guards would in the end cause greater loss than gain, and would encourage deterioration in methods of detection.[7]

Appellant also asserts as ground for reversal the admission in evidence of the testimony of the coroner. The substance of this testimony is that the coroner obtained a dead body at a place he described and had it brought to the morgue.[8] Appellant contends that the coroner's testimony stemmed from the illegally procured initial confessions and, therefore, was inadmissible as the "fruit of the poisonous tree." Since we reverse for the reason previously set forth it is not necessary to pass upon the admissibility of the coroner's testimony. Appellant in any event is entitled to a new trial and it is possible that the coroner may not be called to testify. With the confessions out of the case the question whether the coroner's testimony should be admitted may not arise, or may arise in a very different context at a new trial. Accordingly, we do not decide it.

While we believe the foregoing discussion meets the issues we also believe it desirable to point out that Judge BURGER'S unusual dissenting opinion, in which Chief Judge MILLER and Circuit Judge BASTIAN join, and to which we now refer, rests upon misconceptions.

1. The dissent says our holding "goes far beyond the statute it purports to 'interpret.'" We purport to interpret no statute and no Rule of Criminal Procedure. No interpretation is necessary. All nine members of this court agree with Judge Youngdahl of the District Court that the written confession was obtained in violation of Rule 5(a). They also agree that the written confession was inadmissible under the McNabb-Upshaw-Mallory rule. The Supreme Court, not Rule 5(a), established the exclusionary rule. Rule 5(a) says nothing about the admission or exclusion of evidence. The question before us is not what Rule 5(a) means but whether its conceded violation, which concededly made the written confession inadmissible, also made inadmissible the confession afterwards obtained at the jail.

2. The dissent says our holding "goes * * * far beyond any prior opinion of this court * * *." This seems to mean that this court has not heretofore excluded a confession, made after a preliminary hearing, on the ground that it resulted from an inadmissible confession made during a period of illegal detention before the hearing. But that is just what this court did in the first Jackson case, see n. 5, supra. We held there, as we hold here, that a reaffirming confession which, though it followed a hearing, was made soon after an earlier confession obtained during unlawful detention which preceded the hearing, was "a result" of that illegality and must be excluded.

---

7. See Elkins v. United States, 364 U.S. at 218 n. 8, 80 S.Ct. at 1445, quoting Director J. Edgar Hoover,

"* * * Civil rights violations are all the more regrettable because they are so unnecessary. Professional standards in law enforcement provide for fighting crime with intelligence rather than force. * * * In matters of scientific crime detection, the services of our FBI Laboratory are available to every duly constituted law enforcement officer in the nation. Full use of these and other facilities should make it entirely unnecessary for any officer to feel the need to use dishonorable methods.

"Complete protection of civil rights should be a primary concern of every officer. These rights are basic in the law and our obligation to uphold it leaves no room for any other course of action. Although the great majority in our profession have long since adopted that policy, we cannot yet be entirely proud of our record. Incidents which give justification to charges of civil rights violations by law enforcement officers still occur. * * * This state of affairs ought to be taken as a challenge to all of us. Every progressive police administrator and officer must do everything in his power to bring about such an improvement that our conduct and our record will conclusively prove each of these charges to be false." FBI Law Enforcement Bulletin, September, 1952, pp. 1–2.

8. It was stipulated that the morgue turned over the body to the undertaker to whom the defendant had released it.

The dissent cites Bayer, where the re-affirming confession which the Supreme Court held admissible was made six months after the first confession. The Court said the making of an unusable confession does not "perpetually" disable the confessor from making a usable one. The Court did not suggest that a reaffirming confession made within 24 hours, which is our case, is admissible. Moreover, as Judge Wright points out, Bayer must now be considered in the light of Mallory.

3. An implied premise of the dissent is that courts cannot exclude relevant evidence without specific statutory authority. If that were so, the entire Mc-Nabb-Upshaw-Mallory rule would be invalid, and so would the hearsay rule, among many others.

4. The dissent says we present a picture which is neither accurate nor adequate, but it cites no error of fact, and no omitted fact, which bears on the legal question whether the jail confession is admissible.

5. The dissent suggests that our opinion contains statements inconsistent with Judge Youngdahl's unchallenged finding that the jail confession was voluntary. We have not discussed the problem in terms of voluntariness—see, however, the concurring opinion of Judge Wright— since the basis for our opinion is that the jail confession was the result of the previous confessions which were invalidly obtained and concededly inadmissible under the McNabb-Upshaw-Mallory rule. In order to prevent this rule from becoming a "mockery," to borrow Judge Wright's expression, the jail confession must also be excluded. This basis for our opinion makes it unnecessary to consider the findings of Judge Youngdahl to which the dissent refers.

Moreover, the dissent accepts uncritically the ruling of Judge Youngdahl as matter of law that the jail confession was voluntary. The fact that this ruling was made by the trial judge is not conclusive. See, e. g., Ziang Sung Wan v. United States, 266 U.S. 1, 16, 17, 45 S.Ct. 1, 69 L.Ed. 131.

6. The dissent says: " * * * once the [preliminary] hearing is held the directive of Congress is satisfied." But a tardy hearing does not satisfy the directive of Congress. Rule 5(a) requires a hearing "without unnecessary delay." And as the dissent itself points out, the Supreme Court has emphasized that the arrestee must be taken to a magistrate "as quickly as possible so that he may be advised of his rights."

7. The dissent says that our opinion practically bars any interrogation of an accused even after he has had judicial warning, unless he secures a lawyer and is ready to plead guilty. This is wide of the mark. The decisive factor in this case is that, the day before the jail confession was made, a confession which led to the jail confession had been obtained by the unlawful conduct of the officers which violated specific rights of the defendant spelled out by Rule 5(a). Our opinion excludes only evidence which is due to a violation by the police of their duty under Rule 5(a). Absent such violation and such relationship our opinion precludes no interrogation.

Moreover, nowhere have we said that a post-hearing confession, following one illegally procured before the hearing, must necessarily await the entry of counsel; nor do we predetermine that the passage of no amount of time could remove the taint of a confession obtained in defiance of the exclusionary rule.

8. It is said we abandon the balance between individual rights and the protection of the public. Support for this charge is sought in Mr. Justice Frankfurter's statement that Rule 5(a) should safeguard individual rights "without hampering effective and intelligent law enforcement." But this statement by the author of the McNabb and Mallory opinions means that the police need not, to enforce the law effectively, violate the law. We do not abandon the balance thus adjusted by the Supreme Court. We

adhere to it. Since the jail confession resulted from a previous violation of Rule 5(a) it must be excluded in order to preserve the exclusionary rule from being mocked and nullified. The dissent fails to indicate how, unless this is done, the balance to which it refers can be maintained. It cannot be maintained by nullifying individual rights.

9. The dissent suggests to Congress that our decision should be legislatively reversed. This means either that Congress should take the matter of trial evidence out of the hands of the judiciary where, with rare exceptions, Congress in its wisdom has heretofore left it, or else that Rule 5(a) itself should be so changed as to authorize the police to subject an arrested person, when alone and in their complete control, to interrogation for a sufficient period of time to bring about his self-conviction. Such legislation would encounter problems under the Bill of Rights, including the requirements of due process of law, the guarantee against compulsory self-incrimination, and the right to a genuine trial by jury, presided over by a judge, with the assistance of counsel, not a mere procedure for securing self-conviction at police headquarters. Such a change in Rule 5(a) would in all substance transform our method of enforcing the criminal law from an accusatorial to an inquisitorial system. "Ours is the accusatorial as opposed to the inquisitorial system." Watts v. Indiana, 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801.[9] Our system at times places a greater burden upon the authorities than would an inquisitorial one, depending upon the circumstances. But the suggested innovation would not only encounter constitutional difficulties but would subject the police to temptations of abuse and brutality which a civilized society should not countenance.[10] The frame-

work within which enforcement must now proceed has been carefully formulated for the common good.

The problem presented by this case cannot be understood in terms of the efficiency of permitting an arrested person to be interrogated at length before he has a preliminary hearing. It must be considered in terms of the change in the status and relationship of the parties that takes place when an arrest is made. Once a person is arrested he becomes clothed with the right to have the basis for his arrest inquired into by a magistrate. This fundamental change in status is the basis for the rule that a confession obtained by official failure to recognize and abide by the change is not admissible in evidence. Our decision excludes no confession not attributable to such failure.

It goes without saying that crime sometimes goes undetected, and when detected sometimes goes unproved under the rules of evidence essential to a fair trial. Though we cannot expect perfection the effort to improve the situation is necessary and unending. But there are, it seems to us, wiser approaches to improvement than to make our system of criminal justice an inquisitorial rather than an accusatorial one, and thereby undermine the right to a jury trial as contemplated by the Constitution and open the door to other abuses inherent in such a change.

Mr. J. Edgar Hoover has said, see footnote 7, supra, "Civil rights violations are all the more regrettable because they are so unnecessary." We do not join the dissent in advocating legislation either to attenuate civil rights, to modify a rule of evidence carefully announced and repeatedly affirmed by the Supreme Court, or to overrule a decision of this court which is essential to the integrity of the Supreme Court's rule. There would seem

---

9. Opinion of Mr. Justice Frankfurter, in which Mr. Justice Murphy and Mr. Justice Rutledge joined; and see Ashcraft v. Tennessee, 322 U.S. 143, 152, 64 S.Ct. 921, 88 L.Ed. 1192; Culombe v. Connecticut, 367 U.S. 568, 577, n. 24 at 582, 81 S.Ct. 1860, 6 L.Ed.2d 1037; Hogan and

Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo.L.J. 1, 25.

10. For a thorough analysis and discussion of the problem see Barth, The Price of Liberty, 1961.

to be no need to call upon either Congress or the courts, in the name of balancing community and individual rights, to curtail the latter as they have long been recognized. Their maintenance is nowhere more important than in the Capital of the Nation.

Judge Burger's dissenting opinion, in which Chief Judge Miller and Circuit Judge Bastian join, and which we have discussed above, we think fails to meet the real problem of the case, namely, how the McNabb-Upshaw-Mallory rule of evidence can be maintained if the courts open the door to its evasion by permitting reaffirming confessions, obtained so soon after the officers have secured confessions in violation of law, to be admitted in evidence. We feel that the dissent is largely attributable to the opposition to the exclusionary rule itself clearly disclosed by footnote 5 of the dissenting opinion.

Judge Wright concurs in the reversal of the judgment for the reasons stated in this opinion and for the further reasons stated in his own concurring opinion.

Reversed and remanded.

WRIGHT, Circuit Judge (concurring).

I agree with the ruling that the second, post-arraignment, confession is inadmissible. I agree that it is inadmissible, among other reasons, because it was obtained from the accused before he had an opportunity to obtain counsel, who undoubtedly would have advised him to exercise his right of silence. But I also think that confession was inadmissible because it was tainted by the first confession, admittedly obtained in violation of Rule 5(a),[1] as construed in Mallory.[2] While the court suggests it might be appropriate to so hold and thus overrule our decisions in Goldsmith[3] and

Jackson,[4] it passes the question. I would not.

In remanding for a new trial, the court also passes the question of the admissibility of the coroner's testimony with respect to the body of the victim. Again I would not. To me, the body, and the coroner's findings after examining it, constitute tainted evidence which must be excluded. Because of the importance of these questions, I think it appropriate to develop my views at some length.

I.

On the issue of the admissibility of post-arraignment confessions, there are two extreme positions. The first is that the intervention of a magistrate's warning to the accused that he may remain silent washes the slate clean, erasing all prior wrongdoing by the police, so that any subsequent confession is at least presumptively free of the taint of the illegally obtained admission. The other absolute position is that, because "the psychological and practical disadvantages of having [once] confessed" under illegal conditions can never be wholly overcome —since "the secret is out for good" and "the cat [can never be got] back in the bag"[5]—the extraction of an illegal confession stands as a permanent bar to the admission of any subsequent confession. In my view, both of these rules are unsound. They have the virtue of simplicity, but that is not enough to make either acceptable.

The second rule would be justified if our only concern were to discourage improper police action. Certainly, that is a consideration, and a most important one. Indeed, it is a sufficient reason for excluding an illegally obtained confession. Even a wholly voluntary confession obtained in violation of Rule 5(a) is inadmissible. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819;

1. F.R.Cr.P., Rule 5(a).

2. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

3. Goldsmith v. United States, 107 U.S. App.D.C. 305, 277 F.2d 335.

4. Jackson v. United States, 109 U.S.App. D.C. 233, 285 F.2d 675.

5. United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398.

Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. But we should not forget the rationale of this exclusionary rule, or carry it too far. The Mallory doctrine merely implements Rule 5(a), one of the purposes of which is to prevent *involuntary* confessions. And, though harsh penalties are appropriate, even when the accused has not been coerced, we cannot ignore the public safety in our attempt to correct police wrongdoing. Thus, no one suggests that because a suspect has been illegally detained and has confessed, he must be let free, immune from all further prosecution for the offense. Doubtless, this would be a most effective deterrent to illegal interrogations, but the cost to the public is too great. So, here, while a sound policy requires exclusion of a confession obtained in violation of Rule 5(a), voluntary or not, it does not follow that such wrongdoing "perpetually disables the confessor from making a usable [confession]." United States v. Bayer, 331 U.S. 532, 541, 67 S.Ct. 1394, 1398.

But the other rule, equally mechanical, is no better. Indeed, it is worse. The assumption that a commissioner's statement to an accused, who has already confessed, that he may remain silent, will immediately remove the psychological disadvantage he suffers when confronting the same officers, who know his secret, is simply unrealistic. That being so, to allow the police, who have gained this unfair advantage, knowing the illegality of their action, now to reap the full benefit of it, is to make a mockery of the Mallory exclusionary rule.[6] Here, instead of carrying the stricture for wrongdoing too far, the penalty is nonexistent.

Apparently everyone now agrees that the true test governing the admissibility of an otherwise voluntary subsequent confession is whether it is induced by the first illegal confession, or independent of it. If the subsequent confession is an independent act, it cannot be the fruit of the wrongdoing which tainted the first confession. Nor, assuming absence of coercion and other improper inducements, can it then be involuntary.

Admittedly, it is difficult to determine whether there is a connection between two confessions. But, human nature being what it is, we must recognize a presumption that one is the fruit of the other. This rule of connection admittedly governs where the first confession was coerced. There is then a rebuttable presumption that all subsequent confessions are tainted by the continuing influence of coercion. See Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948; cf. Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481. See also, Note, 70 Yale L.J. 298, at n. 3. The same principle should control with respect to the subsequent reiteration of a confession obtained in violation of Rule 5(a), since, even here, the first confession is at least presumptively involuntary.

It is, of course, true that a finding of coercion or "involuntariness" is unnecessary under the Mallory exclusionary rule. And that is as it should be, considering the impossible handicap of an accused in disproving the usually overwhelming testimony of police officers that he confessed freely. See Mr. Justice Black, dissenting, in Gallegos v. Nebraska, 342 U.S. 55, at 74, 72 S.Ct. 141, 96 L.Ed. 86, and Mr. Justice Douglas, dissenting, in Crooker v. California, 357 U.S. 433, at 447, 78 S.Ct. 1287, 2 L.Ed.2d 1448. But, as already noted, the prime reason for excluding confessions obtained in violation of Rule 5(a) is that illegal detention is so potentially conducive to coercion that any confession procured during that time will be conclusively presumed involuntary. McNabb v. United States, supra;

---

6. The police concerned with the taking of the confessions here admittedly were aware of Mallory. The record shows they were schooled too in our Goldsmith-Jackson gloss.

Upshaw v. United States, supra; Mallory v. United States, supra. See Comment, 10 Am.U.L.Rev. 53, at 54–55. Moreover, even when unaccompanied by the cruder physical or psychological inducements, interrogation of a lone suspect in the jail who has not yet been reassured by a judicial officer of his right to silence is "inherently coercive." See Ashcraft v. Tennessee, 322 U.S. 143, 154, 64 S.Ct. 921, 88 L.Ed. 1192.

The question remains whether the presumption of continuing coercion can survive the magistrate's hearing at which the accused is authoritatively advised, in the presence of his tormentors, that he may remain silent. I think it does. So saying, I do not belittle the commissioner's role or the importance of the statement required by Rule 5(b). But it must be remembered that the Rule contemplates a whole man, freshly arrested. For him, timely counsel as to his constitutional rights is a strong shield against police efforts to obtain a confession. The "broken" man, who has already yielded to coercion, is not so easily revived. See Malinski v. New York, 324 U.S. 401, 428–429, 65 S.Ct. 781, 89 L.Ed. 1029 (Rutledge, J., dissenting in part). Even without any concrete evidence of new coercive tactics after the preliminary hearing, I would continue to presume involuntary the subsequent confession of an accused from whom one illegal confession has already been extracted.

It may be said I make too much of the presumption that a confession obtained during illegal detention was secured by coercive tactics.[7] But the conclusion that two confessions are probably connected does not entirely depend upon the assumption that the first was involuntary and that the influence of initial coercion has continued. For to quote Justice Jackson again, no matter what prompted the first confession, the suspect who has once "let the cat out of the bag" knows that "he can never get the cat back in the bag." United States v. Bayer, supra, 331 U.S. 540, 67 S.Ct. 1398. While the

psychological helplessness that comes from surrender need not last forever, I think the burden should be on the Government to show that a second confession did not spring from a mind in which all the mechanisms of resistance are still subdued by defeat and the apparent futility of further combat. And I do not think the bare admonition required by Rule 5(b) is likely to convert spiritless despair to alert vigilance in a suspect whose secret is already out. Accordingly, I would continue the presumption of connection beyond the preliminary hearing. And, of course, so long as it can be said to be causally related to an admission secured during illegal detention, the subsequent confession is itself "the fruit of wrongdoing," and must be excluded. See McNabb v. United States, supra, 318 U.S. at 345, 63 S.Ct. 608; United States v. Mitchell, 322 U.S. 65, 70, 64 S.Ct. 896, 88 L.Ed. 1140; Upshaw v. United States, supra, 335 U.S. at 413, 69 S.Ct. 170.

The presumption of connection between two confessions is, however, rebuttable. The link can be broken. In my view, a warning in the terms of Rule 5(b) does not overcome the presumption. But it does not follow that nothing will.

It has been suggested that the influence of an illegal confession will be cut off if the committing magistrate advises the accused at his hearing that any prior statement will not be admissible against him. McCormick, Evidence, § 114, p. 237; Note, 26 Texas L.Rev. 536, 538. Coupled with a reasonable breathing space in which to absorb it, an emphatic and categorical ruling to this effect might well be sufficient. But, unfortunately, in the present state of the law, the magistrate is in no position to give such unequivocal assurance. For, under applicable decisions, not every confession obtained prior to the hearing is necessarily tainted. See United States v. Mitchell, supra; Cicenia v. LaGay, 357 U.S. 504, 509, 78 S.Ct. 1297, 2 L.Ed.2d 1523. A watered-down version of the warning,

---

7. See Note, 70 Yale L.J. 298, 306.

to the effect that the prior confession *may* be inadmissible, is obviously of little help. Indeed, it would then be easy enough for the police, on the second interrogation, to convince the suspect that his prior confession is, in fact, binding on him.

Certainly, lapse of time is an important factor. See United States v. Bayer, supra. But even a long interval between two confessions will not show them to be unconnected unless the suspect was, in the meantime, enlarged, or at least left alone to regain his strength. The intervention of counsel is a most important safeguard, because a lawyer can presumably be counted on to bring home to the accused his right of silence and forcibly to impress upon him the value of continued silence, despite an early admission. Yet, here too, the particular facts must be probed, to the extent consistent with the attorney-client privilege. It is, for instance, essential to establish that the attorney knew about the original confession. "Fleeting representation," noted in the official record, is not enough to break the chain of causation that normally connects two confessions. See Goldsmith v. United States, supra, 107 U.S. App.D.C. at 316, 277 F.2d at 346 (dissenting opinion). See also, Jackson v. United States, supra, 109 U.S.App.D.C. at 240, 285 F.2d at 682 (dissenting opinion).

This may boil down to saying that there can be no easy rule as to what evidence of spontaneity will overcome the presumption that a later confession is the fruit of an earlier one, obtained under illegal conditions. In any event, this is not the proper place to attempt to fashion such a rule. I think it sufficient to note now my disagreement with the holdings of Goldsmith and Jackson which, as I read them, deny the propriety of indulging any such presumption or, if they give it fleeting recognition, discard it too quickly. The "reaffirmation doctrine" of those cases is, I think, unrealistic, and I would overrule them. In the present case, there being absolutely no evidence to rebut the presumption that the second confession was the consequence of the first, in fact a mere affirmation of the first, there is no occasion to interpret the facts. On its face, the second confession is the "fruit of wrongdoing," and so must be excluded.

In suggesting that the court should adopt a stricter rule on post-arraignment confessions when the suspect has already confessed during a period of illegal detention, I do not ignore United States v. Bayer, supra. Under the peculiar facts of that case, notably a span of six months between the two confessions, perhaps continuing a presumption of connection would have been unrealistic. But, in any event, on the question of the admissibility of confessions attributable to police wrongdoing through detention in violation of Rule 5(a), Mallory supersedes Bayer, and its command cannot be avoided by expanding the rule of an earlier case. As I have attempted to show, Mallory requires us to put an end to the reaffirmation doctrine espoused in Goldsmith [8] and the second Jackson case.[9] Cf. Jackson v. United States, 106 U.S.App.D.C. 396, 273 F.2d 521 (the first Jackson case).

Moreover, even if Mallory does not compel us, I think we should, on our own, reject the Goldsmith doctrine and adopt a more realistic rule. It is clear we have such power. Indeed, it is the function of this court "to formulate rules of evidence appropriate for the District, so long as the rules chosen do not offend statutory or constitutional limitations." Griffin v. United States, 336 U.S. 704, 714, 69 S.Ct. 814, 819, 93 L.Ed. 993. Of course, as Mallory itself shows, we cannot abuse that power. But, precisely because, "save in exceptional situations where egregious error has been committed," the Supreme Court's "policy is not to interfere" in "matters relating to law enforcement in the District," Fisher v. United States,

---

8. For a criticism of the Goldsmith case, see Note, 74 Harv.L.Rev. 1222.

9. For a criticism of the second Jackson case, see Note, 47 Va.L.Rev. 884.

328 U.S. 463, 476, 66 S.Ct. 1318, 1325, 90 L.Ed. 1382, I conceive it to be our duty to fashion a just rule, even without prompting. See Kelly v. United States, 90 U.S.App.D.C. 125, 194 F.2d 150. Cf. Durham v. United States, 94 U.S.App.D. C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

## II.

Though it assumes the discovery of the victim's body directly resulted from police wrongdoing in obtaining a confession from the accused in violation of Rule 5 (a), the court nevertheless passes the question of the admissibility of the coroner's testimony. Since the question in all probability will recur on retrial, I would face it now.

It is suggested that the Silverthorne [10] Nardone [11] exclusionary rule, barring not only illegally obtained evidence but all the "fruit[s] of the poisonous tree," does not apply in the area of coerced confessions, and that even if it did, the coroner's testimony relating to the body does not fall within its ban because (1) it did not incriminate appellant; (2) the coroner's testimony was merely evidence that a crime had been committed; and (3) since the witness himself in no way connected appellant with the crime, his neutral testimony was not material on the issue of the guilt of the accused.

I cannot agree. To me the rule is as unlimited as it is clear. I cannot improve on the formulation of Mr. Justice Holmes: "Knowledge gained by the Government's own wrong cannot be used by it." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183. I find nothing in Silverthorne or Nardone, or any subsequent case, that distinguishes between more and less rotten "fruits" of police wrongdoing. I do not understand those cases as holding that tainted evidence which, by itself, is not completely damning, should be treated as untainted. Nor does such a distinction survive realistic analysis. It

suffices to pose the case of the murder weapon which is uncovered as the result of an illegally obtained confession. Does anyone suggest that the ballistic expert who has examined it may freely testify as to his findings? Would the fact that he does not know, or does not reveal that he knows, where the gun and bullet came from make a real difference? I would not think so.

It may be that the causal connection between the original wrongdoing and ultimate evidence sometimes "become[s] so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268. See, e. g., Gregory v. United States, 97 U.S.App.D.C. 305, 231 F.2d 258. But this is not such a case. Here the connection is perfectly clear. Even under the "attenuation" doctrine, I assume no one would contend that the evidence relating to the victim's body was admissible merely because it came from the coroner rather than from one of the officers who participated in obtaining the illegal confession. In determining whether evidence sought to be introduced is the fruit of governmental wrongdoing we do not simply count the persons interposed. If that were the test it would be an easy matter to circumvent the Silverthorne-Nardone exclusionary rule by imparting illegally obtained information to a series of "neutral" third persons, the last one of whom could then testify. The extent of the connection must be judged by the strength of the links in the chain, not their number.

## III.

Some will tax these views on the admissibility of post-arraignment reiteration of an illegally obtained confession, and other evidence uncovered through it, with the stricture that they amount to saying "[t]he criminal is to go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (per Cardozo, J.). That phrase makes a telling point. And, considering its

---

10. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

11. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

source, it gives one pause. But, on analysis, like most aphorisms, it proves too glib. Even ignoring the artful slant of the indictment—reversal for a new trial does not set the "criminal"· free, and illegal detention is more than a "blunder"—there are several good answers to the charge.

Pragmatically, it has been shown that exclusionary rules are the only effective deterrent to police wrongdoing. See, e. g., Mapp v. Ohio, 367 U.S. 643, 651–653, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Elkins v. United States, 364 U.S. 206, 217–218, 80 S.Ct. 1437, 4 L.Ed.2d 1669; Wolf v. Colorado, 338 U.S. 25, 41–46, 69 S.Ct. 1359, 93 L.Ed. 1782 (Murphy, J., dissenting). And, with particular reference to courts of the United States dealing with misdeeds by federal officers, it has been rightly said that "no distinction can be taken between the Government as prosecutor and the Government as judge," Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (Holmes, J., dissenting), and that the court cannot "be made the instrument of wrong," but, in "the preservation of the purity of its own temple * * * [it must] protect itself and the government from such prostitution of the criminal law." Sorrells v. United States, 287 U.S. 435, 456, 457, 53 S.Ct. 210, 218, 77 L.Ed. 413 (separate opinion of Roberts, J.). See also, Weeks v. United States, 232 U. S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652; Byars v. United States, 273 U.S. 28, 33, 47 S.Ct. 248, 71 L.Ed. 520; Olmstead v. United States, supra, 277 U.S. at 483–485, 48 S.Ct. 564 (Brandeis, J., dissenting); McNabb v. United States, supra, 318 U.S. at 347, 63 S.Ct. 608.

Certainly, judges should do what they can to prevent official lawlessness, for the spectacle of Government officers breaking the law obviously breeds contempt for the law, or, as Mr. Justice Brandeis put it succinctly, "Crime is contagious." Olmstead v. United States, supra, 277 U.S. at 485, 48 S.Ct. 564 (dissenting opinion). At least the judiciary should not encourage illegal police practices by rewarding guilty officers with a successful prosecution. Moreover, even if excluding the fruits of wrongdoing does not reform the police, "courts themselves [should not become] accomplices in willful disobedience of law." McNabb v. United States, supra, 318 U.S. at 345, 63 S.Ct. at 615.

For me, in cases like this one, the exclusionary rule has a more immediately compelling basis. Whatever the long-range effects of our decisions in terms of broad policy goals, we must, in each case, determine if the particular defendant, whatever his crime, has been justly treated. And, on this basic level, I think we have no choice here but to exclude from this defendant's trial evidence obtained, directly or indirectly, through violation of his constitutional and statutory rights. In my view, it is as simple as that. A fair trial means a trial based on evidence fairly obtained.

BURGER, Circuit Judge, with whom Chief Judge WILBUR K. MILLER and Circuit Judge BASTIAN join (dissenting).

The majority holding today is one of the most significant and far reaching of this court in many years. It goes far beyond the statute it purports to "interpret" and far beyond any prior opinion of this court or the Supreme Court. No statute remotely authorizes the holding. No one even suggests that any right under the Constitution is involved.

A "preview" of the story of this crime shows that Killough beat and strangled his wife, then carried the body after dark to the city dump where he buried it. Five days later Killough told police that his wife was missing, then left town without keeping an appointment to give police more information. After another five days he returned and police then questioned him about the "missing" woman throughout a full day without charging him. At the end of the day he was booked and held. The following day he guided police to the body and signed a confession. He was then charged and taken before a United States Commissioner for a hearing under Rule 5(a).

This shows a plain violation of Rule 5(a) under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and accordingly the trial judge had no choice but to exclude the *written* confession so obtained.

However, on the next day Killough, while at the District Jail and not in police custody and while giving a police officer instructions as to the disposition of his wife's body, restated the essentials of the crime and the trial judge allowed this *oral* confession in evidence as a voluntary statement made *after* he had been duly warned and advised on his rights under Rule 5(a).

The majority now holds that the *voluntary* statements made the day after preliminary hearing are also to be excluded. The theory of the majority is not clear but essentially it rests on the idea that the second confession made after the preliminary hearing is the "fruit" of the first and hence not independent of it.

Judge Youngdahl's comprehensive and careful memorandum makes it clear that he was well aware of the standards laid down by this court for admissibility of a second confession following an earlier inadmissible confession. In addition to being voluntary it must be found by the trier to be independent of the first and made "after time for deliberate reflection." Jackson v. United States, 106 U.S. App.D.C. 396, 398, 273 F.2d 521, 523 (1959). See also same case, second appeal, 109 U.S.App.D.C. 233, 285 F.2d 675 (1960). Judge Youngdahl explicitly found that the second confession was voluntary, independent of the first confession and made "after adequate time for 'deliberate reflection'." Judge Danaher's dissent sets forth the finding on this score in his separate dissent at page 260. The majority operates to reverse Youngdahl's finding sub silentio by holding *as a matter of law* that Killough's second confession is not independent of the first.

To realize the extent and sweep of this holding, it must be viewed against the background of the Supreme Court hold-ings, the statute and the facts. In United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), the defendant, while under restraint of confinement to his military base because of pending criminal charges, gave a second confession to F.B.I. agents, confirming an inadmissible confession made six months earlier. The Court met the claim that the second confession was "fruit" of the first saying:

"Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as *fruit* of the first. *But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables* the confessor from making a usable one after those conditions have been removed." (Emphasis added.) Id. at 540, 67 S.Ct. at 1398.

The effort of the majority to distinguish the Bayer case on the ground of greater time lapse between the two confessions does not stand up under analysis. Killough, with the United States Commissioner's warning fresh in his mind, having shown awareness of his rights by repeatedly referring to his "constitutional rights," nevertheless freely, even volubly as the record shows, for the second time told the whole story of his crime.

The true picture cannot be grasped without a more precise statement of the facts which the majority opinion understandably glosses over. In stating the case the majority opinion presents a picture which is neither accurate nor adequate. It distorts by an inference that the police department has developed a heinous "practice" of using a psychological "third degree" on accused persons after their preliminary hearing in the face of unchallenged and explicit findings by Judge Youngdahl that Killough's state-

ments on the second confession were voluntary and independent of the first. The majority leaps to its conclusion without mentioning Judge Youngdahl's careful findings and does this on the basis of three instances since the Mallory decision, in which an accused, after he had received the requisite judicial warning, freely confessed his crime for a second time. Not having the needed facts in the case it now decides, the majority reaches outside the record of this case and sets forth facts in another case, i. e., Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618. I can understand why the facts of Naples' second confession are relied on for they are vastly different from those in Killough's case. I emphasize that the colloquy set forth in pages 241–242 of the majority opinion is from the case of Naples v. United States, and has no bearing on the instant case.

The majority holding exhibits the same reticence about the statute [1] they "construe" as they do about the facts to which the statute is applied. I can understand why it is ignored; one would not recognize it as the statute construed in the majority opinion. The essence of the congressional command was described by Mr. Justice Frankfurter in the Mallory opinion: that once arrested the individual is to be taken "before a judicial officer as quickly as possible so that he may be advised of his rights." 354 U.S. at 454, 77 S.Ct. at 1359. But once the hearing is held the directive of Congress is satisfied. Congress was *not* dealing with events after that hearing; its command governs events *before* that hearing. If a confession is coerced from a detained person, either before or after that hearing it is not Rule 5(a) but the long established law on coerced statements that controls.

I recite the facts both as to the killing and the treatment of the body because they afford an explanation of psychological reactions which would tend to induce a "confessing" state of mind. These facts are not in dispute for Killough did not take the stand to repudiate the statements he made at the District Jail the day following the preliminary hearing.

On October 18, 1960, appellant reported to police by telephone that his wife had been missing for five days and agreed to meet with police on the 19th to assist in an investigation. When he failed to keep his appointment or contact the police on the 19th, they proceeded with an investigation. They learned from his neighbors and friends that Killough had exhibited little or no concern about the disappearance or absence of his wife when neighbors inquired, and that he reported her disappearance to police only after the urging of her brother.

Police located the missing woman's abandoned car. They found what chemical analysis showed was human blood on a floor mat in the trunk. Five more days elapsed without word from Killough and during the interval police interviewed, among others, Killough's friend, a Miss Holmes; on the 24th she called police saying Killough was at her home. Officers immediately went there and after a brief conversation took Killough to headquarters at 9:30 a. m. He was questioned about the circumstances previously

---

[1.] "(a) Appearance before the Commissioner. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith.

"(b) Statement by the Commissioner. The commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules." Rule 5, Fed.R. Crim.P.

reported concerning his wife's disappearance and his failure to keep his appointment to assist the police. His evasive answers gave police no help toward locating the "missing" woman. At 9:00 p. m. that night he was formally placed under arrest and held.

During the day of October 24th Killough asked for a lawyer. Police gave him a classified telephone directory and offered assistance to call any lawyer he wanted but he said he knew only one, whom he did not want. In answer to some of the questions put to him as to his wife's whereabouts Killough said that he knew his "constitutional rights" and did not have to answer a question that "would incriminate" him.

The following day, between 12:30 and 1:00 p. m. he admitted killing his wife and burying her body at a city dump. He led officers to the spot and the Coroner was called. On returning to headquarters Killough's statements were reduced to writing and signed by him. He was then taken to the United States Commissioner for a preliminary hearing under Rule 5, Fed.R.Crim.P. and a complaint charging homicide was filed. The United States Commissioner and the Clerk separately advised Killough of his right to counsel, his right to remain silent, his right to examine witnesses and admonished him that his statements could be used against him. After the hearing Killough was taken to the District Jail.

Killough's friend Miss Holmes, at whose home he was picked up, attended the Commissioner's hearing, visited Killough at the jail the next morning and agreed to get a lawyer for him. That same morning, Lt. Daly of the Homicide Squad called at the District Jail and requested permission to see Killough who consented in writing to see him.[2] Daly's stated purpose was to return articles of Killough's clothing left at the Police Department and to get instructions as to disposition of Mrs. Killough's body. Killough told the officer he felt very badly about killing his wife and that he had been listening to other prisoners in the cell block discussing newspaper accounts of the crime and was glad they did not know he was the husband of the deceased woman because their comments were not very complimentary. While Daly was so engaged in conversation with Killough, a local attorney known to Killough and presumably in the jail on other business approached Killough asking if there was anything he could do to be of help. Killough said other arrangements were being made for a lawyer. Killough then recounted to Daly the story of the killing and hiding of the body and said he appreciated the fact that the police excused him from staying on the scene while his wife's body was uncovered at the city dump.[3] Killough told Daly that he and his wife had quarreled and that he beat and strangled her. When he realized she was dead he covered her body with blankets and reported to their child and neighbors that she was asleep. That night after the child was asleep he put his wife's body in the trunk of her own car, and then started for the home of his friend Miss Holmes. Then, according to his statement, he concluded it would be better first to dispose of the body, which he did, burying it under rubbish and debris at the Mayfair Dump. He then went to Miss Holmes' apartment. In the course of the conversation Killough expressed

2. Under District Jail procedures it was necessary for Daly to request Killough's permission to visit him. Killough signed a form consenting to see Daly. He could have refused.

3. The effort of the majority to equate Killough's confession with confessions made to clergymen or statements to a doctor or lawyer is a "red herring." The suppression of Killough's statement is not in any sense comparable to the common law or statutory privilege which leads to exclusion of revelations of privileged communications to a doctor, clergyman or lawyer. The privilege Judge Fahy refers to arises out of the *confidential relationship of the parties*. No such relationship exists between police and accused persons. The original communication made to pastor, doctor or lawyer is made in confidence and subject to a condition of non-disclosure.

some surprise to Daly that police had found so much blood on the floor of the car trunk since he had only strangled her and had not used a knife. His explanation for his delayed report to police and his subsequent disappearance was that he had become upset and in no condition to answer "a lot of questions." It is not difficult to understand why a man burdened with the terrible sense of guilt and hearing other prisoners discuss gruesome details of his crime would feel an urge to talk and thereby relieve himself of some of the burden. The urge to confess wrongdoing is such a deep seated natural urge of man that it has been the subject of much research by psychiatrists; at least one psychiatric work has taken title as well as the subject matter from this problem. Reik, The Compulsion To Confess (1959).

Daly testified in response to vigorous cross-examination that he did not go to the jail for the purpose of getting a confession or confirmation of the earlier written confession and had not discussed that possibility with anyone. Daly testified that the Homicide Squad had responsibility for disposing of the body of a homicide victim in the custody of the Morgue and that it was his duty to find out what the next of kin wanted done with the body; he testified that Killough was "overly talkative," needed no prompting and would have continued the conversation longer if Daly had been willing to stay. Killough also requested Daly to return later to visit. The oral admissions to Daly were made approximately 20 hours *after the preliminary hearing.*

Judge Youngdahl ruled that the written confession and evidence of re-enactment of the crime which were completed *before* Killough was presented to the Commissioner, were not admissible under Rule 5(a), Fed.R.Crim.P., but Daly was permitted to testify to the conversation which he had with Killough at the jail on the day following the Rule 5 hearing, this being held by Judge Youngdahl to have been a voluntary statement made while Killough was in *lawful* detention.

### (1)

The admissibility of the second confession is not controlled by Rule 5(a) or by any of the cases in the McNabb-Mallory series, for that Rule and every case which has ever construed it relates to statements made *during* unlawful detention and *prior* to preliminary hearing and its judicial warnings.[4] Every case from McNabb to Mallory treats the preliminary hearing as the terminal point under Rule 5(a). The majority holding constructs an entirely new "statute" and takes a step neither contemplated by Congress nor remotely warranted by the Mallory case. The Mallory doctrine operates to exclude or suppress incriminating statements made *during* "unnecessary delay" before taking the arrested person to a committing magistrate. The entire rationale of Mallory is that the statements are barred because made while detention is unlawful—unlawful for failure to have a prompt hearing.[5]

---

4. To say, as the majority does, that the Supreme Court has not placed exclusion of evidence under the McNabb-Mallory doctrine on constitutional grounds understates the case. The Court *affirmatively* declared that exclusion was ordered "to enforce the congressional requirement" to take an arrested person to a magistrate without unnecessary delay. 354 U.S. at 453, 77 S.Ct. 1356. No judicial decision has ever intimated that exclusion of evidence for violation of Rule 5(a) was based on the Constitution.

5. When the Suppression Doctrine was adopted its advocates urged that the ex-

clusion of evidence considered "tainted" because of the means used to secure it was the only means to compel official compliance with such constitutional provisions as the constitutional prohibition of unreasonable searches. That rationale has persisted to this day. But I suggest that the Suppression Doctrine has totally failed to achieve its stated objective. Some members of this court share that view. As we see it, unless implemented, the Suppression Doctrine is a manifestation of sterile indignation, and is essentially negative. It punishes society as a whole for the transgressions of a poorly trained or badly motivated po-

Today's majority holding, carries the "fruit of the poisonous tree" doctrine to new lengths and means in effect, that statements made either *before or after* the hearing are to be excluded unless the statements are made with the defendant's lawyer at his elbow. For all practical purposes the majority bars any admissions except where the accused is advised and prepared to enter a guilty plea. It would be difficult to overstate the enormity and scope of this incredible "interpretation" of Rule 5(a). Mallory to a large extent foreclosed police investigation *prior* to preliminary hearing; this holding eliminates any interrogation of an accused *after* he has had the judicial warning until he secures a lawyer. By delaying or refusing to retain counsel the defendant can frustrate all interrogation. Indeed if he talks freely, as he did here, the police must refuse to listen! In light of this holding it is ironic that in the Mallory opinion Justice Frankfurter characterized Rule 5(a) as "[a] part of the procedure devised by Congress for safeguarding individual rights without hampering effective and intelligent law enforcement." 354 U.S. at 453, 77 S.Ct. at 1359. This re-writing of an Act of Congress truly "weaves solidities out of gossamer assumptions" that Killough confessed the second time only because he confessed the first time. Stewart v. United States, 366 U.S. 1, 20, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961) (dissenting opinion).

The majority holding is that a second confession coming as soon as 20 hours after the Rule 5(a) hearing is *of necessity* "fruit" of the first and not independent of it. In short it is not independent because four judges say it *cannot* be independent and one judge thinks it is presumptively not independent, all five ignoring Judge Youngdahl's precise application of our Jackson standards to his fact finding which the majority does not disturb. Of course, sometimes a second confession might not be independent of an earlier one whether the time lapse was six days, six weeks or six months. But a second confession could be truly independent under Jackson standards when made one hour after the first. Time lapse is simply *one* factor under the Jackson holding, but for Killough, four of the majority make time the *sole* test and one judge reaches the same result by way of a presumption which he finds unrebutted on this record.[6]

The majority does not overrule the Goldsmith and Jackson holdings[7] but seeks to distinguish Killough's situation from the posture of the defendants in those cases on the ground that Goldsmith and Jackson had advice of counsel before the second confession. But in his dissent in Goldsmith the advice of counsel which now looms so large to Judge Fahy was derided by him as "fleeting representation." Our holdings in the Goldsmith and Jackson cases did not rest on so fragile a distinction as the duality of

liceman but does nothing to get at the heart of the problem. Something more is needed; as a starting point some of us— a minority at the moment—would direct that the District Court, in every case where evidence is suppressed because of an officer's violation of a statute or constitutional provision, send a copy of the transcript on the motion to suppress evidence to the Commissioners of the District of Columbia and other executive officials having responsibility for those officers whose actions are found to warrant suppression of vital evidence in a criminal case.

6. In Judge Fahy's effort to answer this dissent there seems to be a confusing of the two opinions of this court on Jackson's second confession. In the first

Jackson case, 106 U.S.App.D.C. 396, 273 F.2d 521 (1959), we reversed and granted a new trial because the second confession was held not independent of the first. But the District Court on retrial found the second confession was independent and on appeal we affirmed. Jackson v. United States, 109 U.S.App. D.C. 233, 285 F.2d 675 (1960). Thus the first Jackson holding and standards established must be read in light of the second Jackson case, 109 U.S.App.D.C. 233, 285 F.2d 675 (1960).

7. Goldsmith v. United States, 107 U.S. App.D.C. 305, 277 F.2d 335, cert. denied, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960); Jackson v. United States, 109 U.S.App.D.C. 233, 285 F.2d 675 (1960).

warning and advice from both magistrate and counsel but on the more important factor of *judicial* warning. Killough's confession at the jail was made after judicial warning and while in lawful detention. Goldsmith and Jackson rest squarely on United States v. Bayer, supra, and this court ought to follow that holding.

### (2)

The opinion of four judges evades the critical issue of the admissibility of evidence relating to the body of the homicide victim by blandly suggesting that issue "may not arise" on retrial. We are not told how a homicide case can be tried without proof or some evidence that a body was found to establish that a death occurred. I suggest that four of the judges who vote to reverse have an absolute and inescapable obligation to pass on this issue since it will inevitably arise in a new trial and the District Court should not be left without guidance on this critical issue. For such clarification as is possible in light of failure to rule directly on the issue, it should be noted that the four dissenting judges would admit evidence of the body while four judges do not state any position; only one judge would suppress all evidence of the body as "fruit of the poisonous tree." In this posture it seems clear there is no holding in this case that evidence of the victim's body should be suppressed on retrial.

If indeed the evidence relating to the body of a homicide victim is to be excluded because of the manner of its discovery, we will have achieved the distinction of fulfilling Cardozo's prophetic warning that, once adopted, the Suppression Doctrine might some day be carried to these ridiculous lengths. Cardozo did not really believe this could happen; he was indulging in a form of judicial hyperbole to make a point. It is inconceivable that judges would go to such lengths ignoring a reasonable balance between individual rights and protection of the public. See People v. Defore, 242 N.Y. 13, 150 N.E. 585 (1926).

### (3)

In his attempt to answer the dissenting opinions, Judge Fahy says that "a tardy hearing does not satisfy the [Rule 5a] directive of Congress." We agree. However, the effect of his position would be that once an inadmissible confession was obtained in violation of Rule 5(a) that taint clings to all subsequent statements. Judge Wright, however, does not join in this view; his position seems to be clear that a second confession in these circumstances is presumptively "fruit" of the first and hence not independent. But under his separate opinion that is a rebuttable presumption.

Judge Fahy's response to the dissenting opinions also states that the first confession "led to the jail confession"; that "the jail confession resulted from a previous violation of Rule 5(a)"; that "the jail confession was the result of the previous confessions * * *." It is as though repetition and incantation are substitutes for facts and reasons which the District Judge relied upon. No amount of repetition can make sense or soundness out of these "gossamer assumptions." The majority opinion relies on sweeping generalizations about our system being an accusatorial rather than inquisitorial system as though that statement settles some problems. This familiar semantical device may be thought to associate the dissenting position with the horrors of the ancient inquisitions, but we have made it clear that it is *not* the Suppression Doctrine, but its *extension* to this kind of situation, as Cardozo feared it might, to which we vigorously protest.

Judge Wright's separate opinion rests on an erroneous assumption with reference to an important fact; he rejects the second confession because "among other reasons, because it was obtained * * * before he [Killough] had an opportunity to obtain counsel * * *." The record shows that when Killough was arrested his crime was already 10 days old, he had fled the jurisdiction and returned, he had talked for two days of obtaining

counsel, and while he was engaged in the very conversation which constitutes the second confession a lawyer known to him approached him in his cell and offered his services, which Killough rejected. How can it possibly be said that he was denied "opportunity to obtain counsel"? As I see it Judge Wright also confuses the holdings of the McNabb-Mallory line of cases with the coerced confession cases as is suggested by his reference to Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L. Ed.2d 246, and related state cases on *coerced* confessions. The Mallory holding does not rest in any degree on involuntariness or coercion but narrowly as a judicial mechanism to enforce compliance with a procedural command of Congress.

### (4)

I find it difficult to characterize what the court does in this case. To me it is an abuse of judicial power to write what is, in effect, an amendment to Rule 5(a) because some think that Congress did not go far enough. More than that the arrogated power is exercised in a way which offends common sense. Some of the members of the court might remember that there are other branches of government at least equally qualified to frame the laws, explicitly ordained to do just that, and no less concerned than we are with individual liberty. Our task as judges, properly exercised, is a narrow one: to interpret the laws *faithfully* as Congress wrote them, not as we think Congress ought to have provided. Here the majority completely rewrites a statute already strained by a most generous interpretation. Cf. Mallory v. United States supra; Watson v. United States, 101 U.S.App.D.C. 350, 249 F.2d 106 (1957).

There seems to be developing in judicial circles an assumption that Congress, preoccupied with the great foreign and domestic issues of our day, either will not notice or will not get around to reversing even the boldest invasion of the legislative power. But if Congress permits judges to distort by "interpretation"

and to rewrite its statutes, it should not be heard to complain.

Under the guise of protecting legitimate individual rights the majority abandons the balance we are charged with maintaining between individual rights and protection of the public. We make a mockery out of Justice Frankfurter's statement that Rule 5(a) is a procedure to safeguard individual rights "without hampering effective and intelligent law enforcement." Cardozo's warnings go unheeded as the Suppression Doctrine, once merely a tool of judicial power, now becomes an end in itself, dominating the administration of the criminal law and making law enforcement more and more difficult.

If it is to be the law that the courts may not use a voluntary confession, made nearly 24 hours after the judicial warning in a preliminary hearing, after time for "deliberate reflection," after full opportunity to secure counsel and after rejecting offers of counsel then indeed this court will have converted the shield of Rule 5(a) into a sword. What Congress clearly intended as a protection will have become a weapon of special advantage exclusively for the guilty.

DANAHER, Circuit Judge (dissenting).

I prefer to state my position separately.

On or about October 13, 1960, Goldie D. Killough had been tracked by her husband, this appellant, to a house where he suspected she had engaged in an illicit affair with another man. He heard her laughing in an upstairs bedroom, although occupants of the house denied she was there. Her car was outside, and rather than make trouble there, he left to give her a chance to depart quietly. She reached home before her husband, undressed and went to bed. As she lay there, pretending to be asleep, her husband stood over her, talking to her. She ignored him. He opened her pocketbook and found what he deemed ample corroborating physical evidence of her mis-

conduct. Enraged, he throttled her. Goldie Killough, a small woman, struggled for a while, but Killough succeeded in strangling her. He covered her body with a sheet, and that evening, placed it in the trunk of her car. He then passed his girl friend's house, drove to a secluded spot in Northeast Washington, and in a field, Killough concealed the body under a pile of debris.

No witness could testify that Killough did any of these things. No one knew what had happened to Goldie Killough, and no one could know unless Killough should narrate the facts.

My colleagues say that Killough's admissions of such facts after he had received judicial caution from the Commissioner may not be utilized as evidence against him, despite later substantiation and corroboration of the appellant's disclosures.

In McNabb v. United States, 318 U.S. 332, 346, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Supreme Court pointed out that it is the duty of the trial court to entertain a motion for the exclusion of evidence said to have been unlawfully obtained and to hold a hearing to determine whether such motion should be granted or denied. The trial judge in this case explicitly followed that directive. He excluded a confession made by Killough on October 25, 1960, before

he had been presented before the Commissioner. In an able opinion, United States v. Killough, 193 F.Supp. 905 (D. D.C.1961), Judge Youngdahl developed for us the course of the hearing conducted by him. He made findings of fact and drew conclusions of law. Those findings are supported by substantial evidence of record and should not be disregarded unless shown to be clearly erroneous.

The trial judge *found* that when Killough had been brought before the Commissioner, the deputy clerk—who is now the United States Commissioner—advised Killough that he had the right to refrain from making any statement; that any statement he made could be utilized as evidence in a trial against him; that he was entitled to retain counsel; that he was entitled to a preliminary hearing at which either he or his attorney could cross-examine; and that he was entitled to a continuance in order to retain counsel. Killough received similar advice from the late United States Commissioner Splain.

The previous day, October 24, 1960, when properly questioned at headquarters while the police were attempting to solve the mystery of Goldie Killough's disappearance, Killough would neither deny nor admit killing his wife. The trial judge found he had then asserted "a right to refrain from giving statements of a self-incriminatory nature." [1]

---

1. For some ten days police had been investigating. Killough on October 18, 1960, made an appointment to meet the officer in charge the following morning. Instead, he left town. About a week later, Killough's girl friend, a Miss Holmes, called the police and told them he was at her house. They asked Killough to come with them to headquarters. There an officer informed Killough of the results of the investigation over the past week. The officer asked if he had killed her. The record shows:

"He would not deny that. But he would not admit it. We asked him if he knew where his wife's body was, and he did not answer that question. He said that he knew his Constitutional rights, he did not have to answer that question,

that would incriminate him, and he wouldn't answer it at that time.

\* \* \* \* \*

"The Court: When did he make the statement that he didn't want to answer any questions on the ground it might incriminate him?

"The Witness: All during our interrogation.

"The Court: In the afternoon?

"The Witness: Even from the start. He would answer certain questions, but when you brought up as to the possibility of the death of his wife, if he knew his wife's whereabouts or if he harmed her himself, he told us that he knew his Constitutional rights, that he didn't have to answer any question that would incriminate him and he did not want to answer that question."

Killough did not testify.

262

The day following Killough's appearance before the Commissioner, a minister and an undertaker went to the jail. Killough's friend, Miss Holmes, had already been there to see Killough. She left Killough with the intention of securing a lawyer for him.

When Killough on October 24th left Miss Holmes' residence, he brought with him a suitcase. A police lieutenant on October 26th desired to clear up for the property clerk, the matter of disposition of the suitcase. As a member of the homicide squad, it was his duty also to arrange to have Killough release to the undertaker Goldie Killough's body, then at the morgue. The officer went to the jail accordingly, filled out a form on which Killough noted his consent to an interview, and Killough was brought by the jailers to the jail rotunda. There, a lawyer known to Killough shook hands with him, called him by name, and said he had heard about Killough's trouble and felt badly about it. The lawyer added that if there was anything he could do for Killough, he would be glad to do it. The lawyer shook hands with the police lieutenant, and presently went about his business. Killough told the officer he did not wish to use that lawyer.

Killough signed the receipt for the property clerk. He signed the necessary document for the release of his wife's body to the undertaker there present.

Before Killough ever saw the United States Commissioner he knew what his rights are. The police additionally warned him. Thereafter, particularly, the Commissioner's clerk and the Commissioner advised him, in *full and complete compliance* with the requirements of Rule 5, as the trial judge found.

Against that background the trial judge further found that there was no compulsion exercised with respect to any statement made by Killough. None could have been applied under the circumstances, the trial judge said, adding, "Defendant was free to end the conversation at any time." The trial judge further noted:

"The Court—which itself asked Lt. Daly the questions whose answers would have laid the foundation for [a charge of a deliberate police attempt to subvert the Rules] —is satisfied that the lieutenant testified truthfully in stating that he did not go to the jail on the 26th to secure a reaffirmation of the invalid confessions and that he had not spoken to the U. S. Attorney's Office about them before going."

The trial judge permitted the statements made by Killough at the jail on the 26th to be received in evidence against him. Those are the statements which, corroborated from various sources, established Killough's guilt. The trial judge in the light of all of the evidence, reached the following conclusions:

"First, defendant specifically renounces any claim that he was physically maltreated during the period of 'unlawful' detention. Thus, he did not require a significant time period after commitment to recover his reflective powers, if, indeed, he had ever lost them. Second, following the preliminary hearing and his meeting with Lt. Daly, defendant was permitted two conversations with his friend Miss Holmes. Third, the time period which passed between the preliminary hearing and the second confession was over twenty hours. Fourth, defendant's conversation with the lieutenant prior to his actually making the second confession indicated that he had been reflecting on his crime. All these factors support the Court's previously expressed conclusion that during this period defendant had a resurgence of guilt feelings which prompted his desire to confess anew, and support its present conclusion that such confession came after adequate time for 'deliberate reflection.' " [2]

2. United States v. Killough, 193 F.Supp. at 921.

I think the District Judge ruled correctly and in accordance with our law.[3] The Supreme Court of the United States has twice refused to review our statement of the applicable principle. Once an accused has received "judicial caution," he is free to talk or not. If he voluntarily admits his crime, the Supreme Court has said, citing many cases, his confession may be received against him, "although it was made to police officers, while in custody, and in answer to an examination conducted by them." [4]

A majority of my colleagues are, in my view, failing to follow the rule of law which should here control. Although the books are filled with cases to the contrary, their theory carried to its logical conclusion, would even preclude a plea of guilty by one who so pleads because, and when, he knows he had previously during a period of unlawful detention "let the cat out of the bag." The anomaly my colleagues create is the more striking in that no decided case is cited for their position.[5]

I yield to no one in a proper concern for the rights of the accused. Even before Mallory, I wrote for the court in the first Watson case,[6] where we barred a confession extracted during a period of unlawful detention. After Mallory, I wrote the second Watson opinion giving effect to the Mallory rule since the accused had not been arraigned until "judicial caution had lost its purpose." [7]

Rule 5, in short and as here pertinent, requires that the accused be advised of his rights. But the trial judge, as noted, *found* that Killough, throughout, was well aware of his rights. By October 26th, moreover, he had received "judicial caution"—and nevertheless freely unburdened himself to the officer. Unless "serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted," [8] as Judge Hand put it, we should affirm.

It should be noted that Goldie Killough was already dead some five days before Killough, on October 18, notified police she was missing. Very properly, the police sought various items of information, especially since Killough said his wife had left on the 13th after an argument. Killough took police to where he had parked his wife's car after removing his wife's body. The officer—but without then telling Killough—had noticed stains in the car which upon later analysis turned out to be human blood. An appointment was made for Killough to come to headquarters on the 19th to discuss the missing persons report. He did not keep the appointment. No more was heard from him until the morning of the 24th when Miss Holmes telephoned that he was at her home.

Commencing about 9:30 that day, Lieutenant Daly questioned him for about 2½ hours. While Killough was out of town, the officer had checked out certain

3. Goldsmith v. United States, 107 U.S.App. D.C. 305, 277 F.2d 335, cert. denied sub nom. Carter v. United States, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960); Jackson v. United States, 109 U.S.App.D.C. 233, 285 F.2d 675 (1960), cert. denied, 366 U.S. 941, 81 S.Ct. 1666, 6 L.Ed.2d 852 (1961).

4. Tiang Sung Wan v. United States, 266 U.S. 1, 14, 45 S.Ct. 1, 3 (1924); and see United States v. Carignan, 342 U.S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48 (1951); McNabb v. United States, 318 U.S. 332, 346, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

5. See Jackson v. United States, supra note 3, 109 U.S.App.D.C. at 237, 285 F.2d at 679.

6. Watson v. United States, 98 U.S.App. D.C. 221, 226, 234 F.2d 42, 47 (1956).

7. Watson v. United States, 101 U.S.App. D.C. 350, 353, 249 F.2d 106, 109 (1957); and see the first Jackson v. United States, 106 U.S.App.D.C. 396, 273 F.2d 521 (1959), where again we recognized the importance of "judicial caution," to be compared with Jackson v. United States, supra note 3. Cf. Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618 (1962).

8. Di Carlo v. United States, 6 F.2d 364, 368 (2 Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).

earlier information supplied by Killough, had found it incorrect, and told him so. Killough that day was told about the blood stains found on the mat in the car. He had that night to think over the whole situation.[9]

All evidence of what Killough had said prior to his appearance before the Commissioner at 3:43 P.M. on October 25th was excluded by the judge, although it is clear that in some jurisdictions, much if not all of such evidence would have been received. For example, other circuits have not gone as far as we in limiting even prehearing admissions which followed developments in the course of reasonable investigation. The Second Circuit after reading and applying the precedents, including our Goldsmith case, concluded:

> "We believe that when a continuing process of essential investigation is being carried out expeditiously, when the suspect is advised of his constitutional rights, and when there is no reason to believe that the procedures being followed are used merely as an excuse for delay during which a confession can be extracted, detention is not 'arrest,' and in any event is not 'unnecessary,' and an uncoerced confession so obtained is admissible. See Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Georgetown L.J. 1, 20 (1958). Our justification for so holding is the overwhelming public interest and the plain unvarnished fact that without such power society would often find itself helpless to solve crimes and protect its members. *There is no policy in the law or in common sense which compels us to deprive the government of a con-*

*fession which is the fruit of expert and speedy investigation carried out with due regard to the rights of the suspect."* [10] (Emphasis mine.)

I am persuaded that when Killough told what he had done, he did so willingly, with full knowledge of his rights, even before his presentment at the Commissioner's office. Thereafter, in any event, the rights of the accused were fully protected. I am convinced that since the purpose of the Rule was fully met, a fair and impartial administration of criminal justice requires that we affirm the conviction.

It will be remembered that Lieutenant Daly had gone to the jail the day after Killough's appearance before the Commissioner. Killough then agreed to sign a release of his wife's body. Thereupon, an undertaker testified, he saw Killough at the jail and asked him to sign the release that he might take the remains to a funeral home for burial. "Did he sign the release at that time? A. Yes, he did." Killough asked when the body, then at the morgue could be viewed. It was stipulated in open court that the morgue turned over the body which the coroner had viewed to the undertaker for whom Killough had signed the release.

Thus ran the Government's case. The judge completely and properly instructed the jury as to the essential elements of the homicide, with the lesser included offense of manslaughter. The jury found Killough guilty of manslaughter. I would affirm that conviction. I am not persuaded that the efforts of society to protect itself should be rendered futile after this accused, fully advised of his rights, voluntarily admitted that he in secret, had perpetrated this gruesome crime.

---

9. By 11 A.M. the following day, after a 45 minute conversation with a deputy chief, Killough had confessed the killing, and shortly thereafter he guided the officers to where he had concealed the body. There was no suggestion of mistreatment at any time.

10. United States v. Vita, 294 F.2d 524, 534 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); cf. Tillotson v. United States, 97 U.S.App. D.C. 402, 405, 231 F.2d 736, 739, cert. denied, 351 U.S. 989, 76 S.Ct. 1055, 100 L.Ed. 1502 (1956).

I am authorized to state that Chief Judge Miller and Circuit Judges Bastian and Burger concur in the foregoing.

BASTIAN, Circuit Judge (dissenting).

I agree with the dissenting opinions and only wish to add that, in my opinion, the court today has struck a grievous blow at the administration of criminal justice.

In my opinion, the judgment of conviction should be affirmed.

WILBUR K. MILLER, Chief Judge (dissenting).

The dissenting opinions of Judges Danaher and Burger, with which I fully agree, clearly demonstrate the unsoundness of the reasoning of the majority's opinion, so that it is unnecessary for me to discuss the case in detail. But, like Judge Bastian, I want to express my deep concern over the majority's disposition of this case. It is another example of what I think is this court's tendency unduly to emphasize technicalities which protect criminals and hamper law enforcement, against which I have repeatedly protested.

Under our system of criminal law, the legal rights of a defendant must be protected even if the result is prejudice to the public. But justice does not require that those rights be exaggerated so as to protect the defendant against the consequences of his criminal act in a factual situation where he is not entitled to protection. That would be more than justice to the defendant, and unjustifiable prejudice to the public. In our concern for criminals, we should not forget that nice people have some rights too.

It is shocking to me that upon such tortured grounds the court reverses the conviction of this man who has confessed to a bizarre and brutal murder. Of course he can be tried again; but the exclusion of his confession, freely and voluntarily given after he had been told of his rights, which he evidently knew quite well already, will make it unnecessarily difficult to obtain a conviction at a second trial.